**UNITED STATES of America,
Appellant,**

v.

**COLUMBUS COUNTRY CLUB.**

No. 90–1196.

United States Court of Appeals,
Third Circuit.

Argued Aug. 14, 1990.

Decided Oct. 12, 1990.

Order on Denial of Rehearing and Rehearing En Banc Dec. 18, 1990.

A. Leon Higginbotham, Jr., Chief Judge, and Mansmann, Circuit Judge, would grant rehearing by the Court in banc for the reasons set forth in Judge Mansmann's dissent.

Scirica, Nygaard, and Alito, Circuit Judges, would grant rehearing in banc.

Michael M. Baylson, U.S. Atty., Philadelphia, Pa., John R. Dunne, Asst. Atty. Gen., David K. Flynn, Thomas E. Chandler (argued), U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., for appellant.

Joseph P. Gallagher (argued), White and Williams, Philadelphia, Pa., for appellee.

Before MANSMANN, GREENBERG and SEITZ, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

The government appeals from two orders of the district court resulting in the dismissal without trial of its action to enforce Title VIII of the Civil Rights Act of 1968 (the Fair Housing Act), as amended, 42 U.S.C. § 3601 *et seq.* (1988). Jurisdiction in the district court was based on 42 U.S.C. § 3613 (1982), recodified at 42 U.S.C. § 3614 (1988), and 28 U.S.C. § 1345 (1988). We have jurisdiction under 28 U.S.C. § 1291 (1988).

### I.

The facts material to our disposition are not in dispute. The Columbus Country Club (defendant) was formed in 1920 by the Knights of Columbus, a Roman Catholic

men's organization, and incorporated in 1922 as the Tri–Council Country Club. It changed its name to the Columbus Country Club in 1924. In 1936, defendant eliminated the requirement that members belong to the Knights of Columbus but retained the requirement that members be Catholic males. There is no legal relationship with the Knights of Columbus.

Defendant presently maintains a community of 46 summer homes (called "bungalows") located on a 23–acre tract of land along the Delaware River north of Philadelphia. Defendant's by-laws prohibit members from occupying their bungalows from October through April. Even if a family wanted to live in a bungalow year round, the lack of running water and heating facilities would make it impracticable. In addition to the summer homes, the property includes a clubhouse, a barn for lawn care equipment, a chapel and a grotto. Recreational facilities include a tennis court, playground, shuffleboard court and a swimming area. Defendant has a liquor license.

Defendant is organized as a non-profit organization, and its membership is comprised of annual, associate and social members. Annual members are those members who own bungalows and vote on all matters affecting the organization. The annual members own the land collectively. Pursuant to a leasehold agreement, defendant leases bungalow lots to the annual members for an annual fee. Annual members must be members in good standing of the Roman Catholic Church.[1] Associate members are adults over age 21 who live in the bungalows throughout the summer, but are not annual members. These individuals are generally the immediate family of annual members. Social members are close friends and relatives of annual members who do not occupy bungalows throughout the summer. Neither associate members nor social members are required to be Roman Catholic.

Defendant is not formally affiliated with the Roman Catholic Church, nor with any Catholic organization. Prior to 1987, the "purpose" section of defendant's by-laws did not mention Catholicism or affiliation with the Roman Catholic Church. As laid out in the original charter:

> The purpose for which the corporation is formed is the maintenance of a Club for social enjoyments, in order to cultivate cordial relations and sentiments of friendship among its members and provide accommodations for social intercourse, outdoor sport, and healthful recreation for them.

Notwithstanding the lack of formal ties between the Church and defendant, many of its members are practicing Catholics. In 1922, the Archbishop of Philadelphia granted the club special permission for the celebration of mass on the club grounds each Sunday and provided a priest from a nearby town for such services. Some members conduct the rosary each night in the chapel. A statue of the Virgin Mary stands in the grotto near the entrance to the club.

Defendant follows a formal procedure in admitting new members to the community. Since the 1987 amendments to the by-laws, the membership applications must be accompanied by a written recommendation from the applicant's parish priest stating that the applicant is a practicing Roman Catholic in good standing. The full Board, by majority vote, makes the final decision on the admission of new members. There have been thirty-one transfers of ownership interests in bungalows since 1970. Since 1968, only four applicants have not been approved for annual membership.

## II.

This lawsuit stems from the efforts of associate member Anita Gualtieri to become an annual member. Mrs. Gualtieri first applied for membership in 1986 so that she could purchase from her mother the leasehold on the bungalow that her family had held since the 1950's.[2] She was

---

1. Until amendment of the by-laws in 1987, the club restricted annual membership to men.

2. Mrs. Gualtieri's mother inherited her deceased husband's leasehold and quasi-proprietary interest in their bungalow. As a widow, she was given all the rights under the leasehold except annual membership in the club since at that time annual membership was restricted to males.

informed that she was not eligible for annual membership because she was a woman. Her husband was also ineligible for annual membership because he was not a member of the Roman Catholic Church. Failing to have the eligibility requirements amended, Mrs. Gualtieri wrote to the Cardinal's Commission on Human Relations and Urban Ministry to complain of defendant's discriminatory practices. After an investigation, the Archdiocese informed defendant that the allegations were not unwarranted and threatened to withdraw permission to hold mass at the club. Subsequently, defendant revised its by-laws to make them gender-neutral, but did not alter the requirement that annual members be Roman Catholic. Rather, language was added to the purpose section emphasizing the religious aspects of the community's life and adding the requirement of a written statement from the parish priest attesting to an applicant's status as a member of the Roman Catholic Church.

Mrs. Gualtieri reapplied for annual membership in 1987. The Board of Governors considered and voted against her application based allegedly on the family's prior demonstrated lack of ability to get along with the community and lack of interest in the religious aspects of the community.

Mrs. Gualtieri notified the Civil Rights Division of the Department of Justice of defendant's policies, and it subsequently filed suit, alleging a pattern and practice of discrimination in the sale of dwellings, on account of religion and sex, in violation of the Fair Housing Act. After a hearing on the parties' cross-motions for summary judgment, the district court held that defendant was exempt from the Act under both the religious organization and private club exemptions. The court granted defendant's motion for summary judgment on the religious discrimination claim. The court went on to deny both parties' motions for summary judgment on the sex discrimination claim because there was a disputed issue of material fact. The government filed a motion for reconsideration, noting that if the private club exemption applied, it would bar both the sex and religious discrimination claims. The district court subsequently granted the motion and then dismissed the action in its entirety with prejudice.

The government filed a timely notice of appeal. This court exercises plenary review over the grant of summary judgment. *United States v. One 107.9 Acre Parcel of Land*, 898 F.2d 396, 398 (3d Cir.1990). Viewing the record in the light most favorable to the government, we may affirm only if there is no genuine issue of material fact and defendant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The parties do not assert that there are material issues of fact. Therefore, our task is to determine whether the "evidence ... is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

### III.

### FAIR HOUSING ACT

The government alleges that defendant's policy and practice of prohibiting the sale of bungalows to non-Catholics violates the Fair Housing Act. That Act makes it unlawful "[t]o refuse to sell or rent ... or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a) (1988). Defendant does not deny that it discriminates on the basis of religion; rather, it contends that the bungalows are not "dwellings" because they are not capable of being occupied as year-round residences. Thus, defendant asserts that the Fair Housing Act does not apply to it.

This court exercises plenary review over questions of statutory construction. *Chrysler Credit Corp. v. First Nat'l Bank and Trust Co.*, 746 F.2d 200, 202 (3d Cir. 1984). Furthermore, "[t]o the extent that we review the application of the law to the facts, our review is plenary." *United States v. Lansdowne Swim Club*, 894 F.2d 83, 85 (3d Cir.1990); *see also Petrella v. Kashlan*, 826 F.2d 1340, 1343 (3d Cir.1987); *United States v. Adams*, 759 F.2d 1099,

1106 (3d Cir.), *cert. denied,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985).

■ This court must first determine whether defendant's bungalows are dwellings. The Fair Housing Act defines "dwelling" to mean:

any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

42 U.S.C. § 3602(b) (1988). Although the meaning of the word "residence" is central to understanding this definition, the Act provides no statutory definition of that term. In such cases, "it is appropriate to assume that the ordinary meaning of the language that Congress employed 'accurately expresses the legislative purpose.'" *Mills Music, Inc. v. Snyder,* 469 U.S. 153, 164, 105 S.Ct. 638, 645, 83 L.Ed.2d 556 (1985) (quoting *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 195, 105 S.Ct. 658, 662, 83 L.Ed.2d 582 (1985)).

In *United States v. Hughes Memorial Home,* 396 F.Supp. 544, 549 (W.D. Va. 1975), the court followed this rule of statutory construction and concluded that Title VIII applied to a children's home. In reaching that conclusion, the court applied the definition in Webster's Third New International Dictionary which provides that a residence is:

a temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from the place of temporary sojourn or transient visit.

*Id.*

Other courts that have looked at the issue of temporary residence have agreed with *Hughes Memorial. See Patel v. Holley House Motels,* 483 F.Supp. 374, 381 (S.D. Ala.1979) (a motel is not a dwelling because it is not used for occupancy as a residence, but rather provides lodgings to transient guests); *Baxter v. City of Belleville,* 720 F.Supp. 720, 731 (S.D. Ill.1989) (facility for AIDS victims is a dwelling

because persons "will not be living there as mere transients"); *see also,* R. Schwemm, *Housing Discrimination Law* 53 (1983) (Title VIII "would presumably cover ... facilities whose occupants remain for more than a brief period of time and who view their rooms as a residence 'to return to.'"). We agree with these cases and hold that the central inquiry is whether the defendant's annual members intend to remain in the bungalows for any significant period of time and whether they view their bungalows as a place to return to.

■ Applying this standard to the undisputed facts, we conclude that the annual members are not "mere transients." In any year, annual members may spend up to five months in their bungalows. Furthermore, nearly all of the annual members return to their bungalows summer after summer. Indeed, in the last twenty years there have been only thirty-one transfers of ownership within the community of forty-six bungalows. Consequently, defendant's bungalows fall within the ordinary meaning of "residence" and must be considered dwellings for purposes of the Fair Housing Act.

Finally, there is no indication in the statutory language that Congress intended to limit coverage of the Act to year-round places of abode and exempt seasonal dwellings. To recognize a distinction based on seasonal residency would, as the government contends, create a broad exception to the Act that would permit, for example, residents in a private development of summer homes to lawfully exclude blacks from owning, renting or occupying the homes. Therefore, we agree with the district court that the bungalows fall within the statutory definition of "dwelling" and that defendant is subject to the provisions of the Act.

## IV.

### STATUTORY EXEMPTIONS

Defendant asserts that even if the bungalows fall within the statutory definition of "dwelling," it is exempt from the Fair

Housing Act under the exemptions provided by 42 U.S.C. § 3607(a) for religious organizations and private clubs. "Under general principles of statutory construction, '[o]ne who claims the benefit of an exception from the prohibition of a statute has the burden of proving that his claim comes within the exception.'" *Mills Music, Inc., v. Snyder*, 469 U.S. 153, 188 n. 20, 105 S.Ct. 638, 657 n. 20, 83 L.Ed.2d 556 (1985) (White, J., dissenting) (quoting 2A C. Sands, *Sutherland on Statutory Construction* § 47.11, at 145 (rev. 4th ed. 1984)); *see also United States v. First City Nat'l Bank*, 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967); *cf. United States v. Lansdowne Swim Club*, 894 F.2d 83, 85 (3d Cir.1990) (burden on defendant to show entitlement to Title II private club exemption); *Singleton v. Gendason*, 545 F.2d 1224, 1226 (9th Cir.1976) (burden on defendants-appellees to show entitlement to Title VIII single-family exemption, 42 U.S.C. § 3603(b)(1)). Thus, defendant has the burden of proving that it falls within the statutory exemption provided for religious organizations or private clubs as a matter of law.

## RELIGIOUS ORGANIZATION EXEMPTION

■ Defendant's first affirmative defense is that it is exempt from the Fair Housing Act under section 807(a)'s exemption for religious organizations. That exemption provides, in pertinent part that:

Nothing in this subchapter shall prohibit a religious organization, association, or society, or any non-profit institution or organization operated, supervised or controlled by or in conjunction with a religious organization, association, or society, from limiting the sale, rental or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion, or from giving preference to such persons, unless membership in such religion is restricted

on account of race, color, or national origin.

42 U.S.C. § 3607(a) (1988). To fit into this exemption, defendant must prove that it is either: (1) a religious organization, or (2) a non-profit organization "operated, supervised or controlled by or in conjunction with" a religious organization.

The district court concluded and defendant does not dispute that it is not itself a "religious organization." The dispute centers instead upon whether defendant is "operated, supervised or controlled by or in conjunction with" a religious organization.

The government argues that the quoted language implies a hierarchical relationship in which the non-profit entity is subordinate to the religious organization. At the very least, the government contends, there must be some direct affiliation between the religious organization and the other organization, as would be the case with a religious school, for example. This interpretation finds some support in the limited legislative history.[3] Senator Mondale, whose amendment to the 1968 Civil Rights Act was adopted by Congress to create Title VIII, stated: "There is an exemption to permit religious institutions *or schools, etc., affiliated with them*, to give preference in housing to persons of their own religion despite the Act." 114 Cong.Rec. 2273 (Feb. 6, 1968) (emphasis added).

As the government argues, the Catholic Church does not operate, supervise or control defendant. There is no formal or legal relationship between them. At the most, the Church approves of and supports defendant by permitting religious services to be conducted on the premises.

Defendant responds that it is "operated in conjunction with a religious organization" and is directly affiliated with the Catholic Archdiocese. In support of its response, defendant argues that the exemption for religious organizations should be read broadly, and that the undisputed

3. Since the statute was enacted with only minimal changes from the way it was first introduced by Senator Dirksen on the floor of the Senate, its legislative history does not include the committee reports and other documents that usually accompany major legislation. *See Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 147 n. 29 (3d Cir.1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 1458, 55 L.Ed.2d 499 (1978).

facts demonstrate that defendant is entitled to the exemption as a matter of law.

Defendant contends that the broad language of the exemption and the common dictionary meaning of the words used indicate that the relationship between the religious organization and the non-profit organization may consist of anything ranging from a formal, highly structured, hierarchical relationship to an informal, loosely-structured relationship. Additionally, defendant asserts, the religious exemption reflects Congress's sensitivity to first amendment rights. Consequently, defendant argues, the exemption should be broadly construed to cover activity that is permitted, but not required, by the Church.

We cannot agree with defendant's contention that the exemption is to be read broadly. A unanimous Supreme Court mandated in *Trafficante v. Metropolitan Life Ins.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), a "generous construction" of the Fair Housing Act, *id.* at 212, 93 S.Ct. at 368, in order to carry out a "policy that Congress considered to be of the highest priority." *Id.* at 211, 93 S.Ct. at 367. *See also Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 147 (3d Cir.1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 1458, 55 L.Ed.2d 499 (1978). The logical corollary to such a construction, as well as the general rule of statutory interpretation, is to construe narrowly any exemptions to the Act. Such a narrow reading is also supported by the only case interpreting Title VIII's religious exemption that we have found. *See United States v. Hughes Memorial Home*, 396 F.Supp. 544, 550 (W.D. Va.1975) ("In view of the Supreme Court's holding that the Fair Housing Act must be accorded a generous construction, the general principle requiring the strict reading of exemptions from the Act applies here with even greater force.") (citation omitted).

In holding that defendant fell within the exemption for religious organizations, the district court relied upon the defendant's affiliation with the Church as evidenced by the Church's grant of the privilege of having weekly mass celebrated on the grounds and its tacit approval of the recital of the rosary. In reaching its conclusion, the district court found that the Catholic Church does not actually "control" the club or its operations. The district court did state, however, that "the persons who, over the years, have operated and controlled the club, have done so 'in conjunction with' their continuing obligations as members of the Roman Catholic faith," and went on to conclude that "[a]s a practical matter, by virtue of its ability to grant or withhold the privilege of holding religious services in the club chapel ... the Archdiocese does possess a very significant degree of control over the club itself." *United States v. Columbus Country Club*, No. 87–8164, slip op. at 10–11, 1989 WL149935 (E.D.Pa. 1989).

We do not think that these undisputed facts are sufficient to hold that defendant carried its burden. The critical words of the exemption are "in conjunction with," and so there must be a mutual relationship between the non-profit society and a religious organization. The existence of this relationship cannot depend solely on the activities of the non-profit organization nor be viewed only from its perspective. Indeed, evidence of the club's unilateral activities would go to whether it is itself a religious organization not to whether it is operated "in conjunction with" a religious organization. Furthermore, the Church's ability to withdraw permission to hold mass and the fact that on one occasion it may have indirectly influenced the club's Board of Governors by threatening to do so are not enough. Without further evidence of interaction or involvement by the Church, we cannot conclude that as a matter of law the Church controlled the defendant or that the defendant was operated "in conjunction with" the Church. Consequently, on this record and in light of our unwillingness to read the statutory exemption broadly, we hold that the defendant failed to carry its burden of proving its entitlement to the religious organization exemption.

### PRIVATE CLUB EXEMPTION

Defendant's second affirmative defense is that it falls within the exemption

for private clubs, as the district court held. Again, the defendant has the burden of proving its entitlement to this statutory exemption.

The Fair Housing Act states in pertinent part:

> Nor shall anything in this subchapter prohibit a private club not in fact open to the public, which as an incident to its primary purpose or purposes provides *lodgings* which it owns or operates for other than a commercial purpose, from *limiting the rental or occupancy* of such *lodgings* to its members or from giving preference to its members.

42 U.S.C. § 3607(a) (1988) (emphasis added). We believe that to fall within this statutory exemption five conditions must be met. The defendant must: (1) be a "private club not in fact open to the public"; (2) provide "lodgings;" and (3) only limit the "rental or occupancy of such lodgings." Furthermore, if a defendant provides "lodgings," those lodgings must be: (4) provided "as an incident to its [defendant's] primary purpose or purposes;" and (5) owned or operated "for other than a commercial purpose." We do not address the district court's determination that the defendant was a private club satisfying condition (1) because we are content that our conclusions with respect to conditions (2) and (3) are fully dispositive.

To determine whether defendant's bungalows satisfy condition (2), we begin, as we must, by examining the statutory text. *See Mills Music, Inc., v. Snyder,* 469 U.S. 153, 164, 105 S.Ct. 638, 645, 83 L.Ed.2d 556 (1985). Since the private club exemption is part of the same section that provides the exemption for religious organizations, it is instructive to note the differences. In the first place, the word "lodgings" has replaced the word "dwellings," and the word "sale" has been deleted. Furthermore, the private club exemption requires that the club provide lodgings only "as an incident to its primary purpose or purposes." Thus, the overall effect of these changes is to carefully limit the exemption.

Congress' intention to limit the exemption is borne out by the legislative history.[4] Senator Kuchel, the sponsor of the amendment that modified the wording of the exemption, explained that the purpose of the changes was: "to tighten the exemption now provided in the substitute referring to bona fide private clubs." 114 Cong.Rec. 5526 (Mar. 6, 1968).

Defendant argues that it provides "lodgings," because according to the dictionary, a lodging is a "dwelling," and Congress drew no durational distinction between the two terms, as it did in Title II when it modified "lodging" with the words "to transient guests."[5] This indicates, defendant contends, that the word lodging by itself does not connote occupancy of limited duration and therefore the terms "lodging" and "dwelling" should be considered interchangeable.

The government responds that defendant does not provide "lodgings" because its bungalows are "dwellings" in the sense of summer residences, not temporary accommodations as Congress intended.

Although the district court recognized that a distinction might be drawn between "dwelling" and "lodging" on the basis of the duration of contemplated occupancy, it did not agree that Congress intended this distinction to have any significance. We do not think that this conclusion comports

---

4. The private club exemption was introduced in Senator Dirksen's amendment to his own substitute bill. The original wording was:

> Nor shall anything in this title prohibit a bona fide private club from limiting the *sale,* rental, or occupancy of *dwellings* which it owns or operates for other than a commercial purpose to members of the club or from giving preference to such members.

114 Cong. Rec. 4690 (Feb. 29, 1968) (emphasis added). Senator Kuchel subsequently introduced an amendment that substituted the word "lodgings" for "dwellings," deleted the word "sale," and added the language "as an incident to its primary purpose or purposes." 114 Cong. Rec. 5526 (Mar. 6, 1968).

5. Section 201 et seq. of Title II prohibits discrimination in places of public accommodation. 42 U.S.C. § 2000a et seq. (1988). A place of public accommodation is defined in part as: "any inn, hotel, motel, or other establishment which provides lodging to transient guests...." 42 U.S.C. § 2000a(b)(1) (1988).

with Congress' deliberate substitution of the word "lodging" for "dwelling" and the plain statement of intent repeatedly expressed by Senator Kuchel, the amendment's sponsor, that the language modifications were designed "to tighten [Senator Dirksen's] amendment as much as possible to avoid possible abuse." 114 Cong.Rec. 5526 (Mar. 6, 1968). Therefore, we conclude that defendant has not shown that it provides "lodgings" as required by condition (2) of the private club exemption.

 The government also argues that the defendant fails to satisfy condition (3) because the private club exemption, by its express terms, applies only to the "rental or occupancy" of lodgings, not to their sale. Thus, the government claims that even if defendant were found to meet all the other conditions of the private club exemption, it cannot protect the discriminatory sale of dwellings by its annual members. Again, the government asserts that this interpretation is borne out by the legislative history which indicates that the word "sale" was deleted at the same time that the word "lodging" was substituted for "dwelling."

At oral argument, defendant responded to the government's argument, contending that it meets the "rental or occupancy" requirement. Defendant's argument is that by limiting the sale of the bungalows to Catholics, the club is limiting the occupancy of the bungalows and the rental of the ground on which the bungalows sit. So, defendant argues, the club is "in effect" limiting the occupancy and rental of lodgings.

Although the district court noted the government's argument, it did not address the government's position. We believe that the plain language of the exemption and the legislative history of the Act exempt only the "rental or occupancy" of lodgings, not their sale. So, even though limiting the sale of bungalows to Catholics might have the effect of limiting the rental or occupancy of lodgings, we conclude that defendant's policy and practice of discriminating against persons in the sale of bungalows falls outside the plain language of the private club exemption.

We conclude that defendant has failed to show that the bungalows are lodgings and that its restrictions upon the sale of bungalows are merely limits on "rental or occupancy." Therefore, we conclude that as a matter of law defendant has not met its burden of proving that it falls within Title VIII's limited statutory exemption for private clubs.

Defendant also argues that application of the Fair Housing Act violates the free exercise and establishment clauses of the first amendment as well as the defendant's first amendment right to free association. Because the district court did not address those arguments, we will not do so either, preferring to have the district court consider them in the first instance.

## V.

We are satisfied that the record does not, as a matter of law, support summary judgment for defendant on either of its affirmative defenses. We will, therefore, reverse the orders of the district court ruling that defendant meets the religious organization and private club exemptions of the Fair Housing Act and dismissing the government's claim against the Columbus Country Club and remand for further proceedings.

MANSMANN, Circuit Judge, dissenting.

I dissent because I believe that the panel majority, in construing the religious exemption from the Fair Housing Act, unduly minimizes significant connections between the Columbus Country Club and the Catholic Church. By insisting that a formal hierarchical relationship be established between the Church and the Club before the exemption may be invoked, the majority reaches a result which, in my view, was not anticipated by those drafting the Fair Housing Act. The narrow construction of the exemption has potentially significant implications for those wishing sincerely to live and associate in religious community.

It is important to note, at the outset, that this case is the first since the enactment of the Fair Housing Act in 1968 to construe

the Act's religious exemption provision.[1] This has not been a fertile ground for litigation and I believe that our analysis should reflect that fact, by being firmly grounded in the statutory language and the facts of this case.

I.

In order to assess the majority's conclusions regarding the inapplicability of the religious exemption, I must detail the history and dimension of Columbus Country Club's connection with the Roman Catholic Church. It is against this background that the statutory exemption must be evaluated.

The Columbus Country Club was organized in 1920 by the Knights of Columbus, a Roman Catholic men's organization. In 1922, while members were still required to belong to the Knights of Columbus, title to the land was taken in the name of a separate non-profit corporation. In 1924, the Club was given its current name and, in 1936, the Club eliminated the requirement that members be affiliated with the Knights of Columbus; membership continued to be limited to Catholic males.[2]

As the majority points out, the Club's annual members are required to be members in good standing of the Roman Catholic Church. Prospective annual members are required to obtain the endorsement of an annual member and complete a one-page application form containing, among other things, the name of the prospective purchaser's parish. The applicant must demonstrate that he or she, too, is a practicing Roman Catholic in good standing with his or her parish church; a statement to this effect from the parish priest must accompany the application.[3]

The Club contends that, from its inception, religious expression has been an integral feature of the Club community. When the Club opened, the grounds were dedicated in a special ceremony led by the organization's spiritual director and two priests. During the period from 1920–1922, a special mass was celebrated each Sunday in the local parish for the benefit of Club members.

In 1922, and for the succeeding sixty-eight years, the Archbishop of Philadelphia has granted the Club special permission to have mass celebrated in a chapel on the Club grounds on each Sunday of the summer season. The Catholic Archdiocese of Philadelphia provides the Club with the services of a priest who celebrates the weekly mass and leads other special religious ceremonies observed by the Club members.

Family members meet in the chapel each summer evening to pray the rosary and a consecrated statue of the Blessed Mother stands in an area of the grounds known as the "grotto." Both the chapel and the grotto are maintained by club members and the Sunday offering taken in the chapel is remitted to the local parish.

The affidavit of Reverend Richard J. Fleming, pastor of the parish in which the Club is located, was appended to the Club's motion for summary judgment. That affidavit states that because Columbus Country Club, "a community of Roman Catholic families who live, pray, and worship together through the summer months ... is a Roman Catholic organization, the Archdiocese of Philadelphia provides it with the special privilege of celebrating mass on its grounds. This is a very rare and unusual privilege." The affidavit also establishes that a parish priest celebrates mass at the Club on the Fourth of July and on August 15, a holy day of obligation. Club families take an active role in celebration of the Mass which, each week, is said in honor of the deceased members of a particular Club family.

1. While the panel majority cites *United States v. Hughes Memorial Home*, 396 F.Supp. 544, 550 (W.D.Va.1975) as having interpreted Title VIII's religious exemption, that court did not address the exemption substantively as it determined, initially, that the exemption was totally inapplicable to the facts presented.

2. By an amendment to the bylaws made in 1987, women were permitted membership. The requirement that members be members of the Catholic faith was retained.

3. The Club's uncontroverted contention is that evidence of common interest in the religious activities of the Club and the parish priest's attestation to the applicant's good standing in that parish have always been membership requirements. While these requirements were always observed, they were not codified in the Club Bylaws until 1987.

The same affidavit notes that the statue of the Blessed Mother on Club grounds was consecrated by a priest in a special ceremony for the benefit of Club families and the Club is in the process of applying for the special privilege of having the chapel named in honor of a woman soon to be canonized a saint.

Church doctrine recognizes the value of the assembly of a community of believers as an integral facet of the practice of Catholicism. Furthermore, the affidavit states that "the Roman Catholic church recognizes and approves of the assembly of a group of Roman Catholic families for a summer retreat of weekly worship and daily prayer together as a valuable and legitimate exercise of their religious beliefs."

## II.

Congress drafted the religious organization exemption broadly to apply to any "religious organization, association, or society or any non-profit institution or organization operated, supervised or controlled by or in conjunction with a religious organization...." 42 U.S.C. § 3607(a) (1988). Given the use of the disjunctive form here, the Club argues that Congress intended that the statutory exemption apply to any non-profit organization that is "operated by" or "supervised by" or "controlled by" or "operated in conjunction with" or "controlled in conjunction with" a religious organization. The district court found that, at the very least, the Club operated in conjunction with the Roman Catholic Church, and was, therefore, entitled to the Act's religious exemption:

> [A]lthough, as a strictly legal proposition, the Roman Catholic Archdiocese does not actually "control" the club or its operations, it is clear that the persons who, over the years, have operated and controlled the club have do so "in conjunction with" their continuing obligations as members of the Roman Catholic faith. As a practical matter, by virtue of its ability to grant or withhold the privilege of holding services in the Club chapel—a privilege which is central to the traditional operations of the club—

the Archdiocese does possess a very significant degree of control over the club itself.

*United States v. Columbus Country Club*, No. 87–8164, slip op. at 10–11 (E.D.Pa. 1989).

The majority, evaluating all of the undisputed facts detailed above and the district court's conclusion, concludes, surprisingly to me, that the Country Club has not carried the burden of establishing entitlement to the religious organization exemption. According to the majority, the words "in conjunction with" imply a "mutual relationship between a non-profit society and a religious organization. The existence of this relationship cannot depend solely on the activities of the non-profit organization nor be viewed only from its perspective." Majority at 883. The majority concludes that "[w]ithout further evidence of interaction or involvement by the Church, we cannot conclude that as a matter of law the Church controlled the defendant or that the defendant was operated 'in conjunction with' the Church." *Id.*

This result is not compelled by the text of the exemption itself. The language of the exemption does not focus solely upon "control" or "mutuality" but describes a number of different types of relationships which serve to bring an organization within the terms of the exemption. The majority's reliance on equivocal legislative history notwithstanding, I think it clear that the Columbus Country Club, under the terms of the statute itself, qualifies for the religious organization exemption. If Congress had meant to make control or mutuality the determinative evaluative criterion, it certainly would have expressed this intention more clearly. The exemption here must be interpreted at least as broadly as the common meaning of its text, rather than restricted to circumstances far more narrow than the meaning conveys. *See Caminetti v. United States*, 242 U.S. 470, 485–486, 37 S.Ct. 192, 194–195, 61 L.Ed. 442 (1917)(words used in a statute are presumed, unless the contrary appears, to be used in their ordinary and usual sense and with the meaning commonly attributed to them.) The majority approach simply is

not supported by the plain language of the exemption.

## III.

Even if a mutuality standard were clearly expressed in the text of the exemption, I would find that that standard has been met. In examining the history of Columbus Country Club and, the *uncontroverted* details of its connections to the Catholic church, I find it difficult to imagine what more the panel majority could want in terms of mutuality. The Club has operated to support the Church, both monetarily and by its members' living and practicing the tenets of the Roman Catholic faith. The Church, in turn, has supported the Club, by participating in its founding, by providing prayer support and by making clergy available to the community where it does not do so in other cases; the Church's provision of a priest to conduct services is central to the Club's purpose and philosophy and, as the district court concluded, certainly provides the Church with a substantial measure of *de facto* control over Club operations. The Church has, in fact, exercised its influence over the Club in bringing it into compliance with the Church's policy against sex discrimination.

Throughout this litigation, the government has taken the position, which the majority apparently accepts, that the Columbus Country Club is nothing more than a homeowner's association whose "one link" to the Church—the weekly mass—is not sufficient to support exemption from the Fair Housing Act. In the government's view—again tacitly adopted by the majority—the extremely narrow interpretation of the exemption's phrase "in conjunction with" is appropriate. Otherwise, the argument goes, any group of persons holding the same religious beliefs could exclude others from their housing development simply by calling themselves a religious organization and arranging for a local church to hold certain services on the development's grounds.

Where the legislative history underlying this exemption is, by the majority's admission, scant, there is no guiding caselaw, and the wording of the exemption itself is quite broad, I think it inadvisable to read into the exemption a requirement of formality that is not clearly expressed. This is especially so given the first amendment implications of this case.

I conclude that the uncontroverted record does *not* support the conclusion that the Club is nothing more than a homeowner's association bent on excluding non-Catholics. The religious dimension of this Club is substantial and does not, as the parties agree, represent a subterfuge to evade the requirements of the Fair Housing Act. The Club's organization and religious character preceded enactment of the Fair Housing Act by more than 48 years and there is not the slightest indication of bad faith in the Club's having limited its annual membership to those of the Catholic faith. Subjecting the Club to the Fair Housing Act will destroy its character as a religious community where like-minded individuals are able to support one another, communally express their beliefs and model their values to their children. I cannot believe that this was the kind of "wrong" which the Fair Housing Act was drafted to remedy. From a policy viewpoint, the conclusion reached by the majority here today may have far-reaching impact on groups such as church camps, retreats and other organizations through which individuals associate to practice their faith.

While another case, presenting different facts, may require another result, here I believe that the district court's conclusion that the Club is exempt from allegations of religious discrimination under the Fair Housing Act is correct and should be affirmed.

## ORDER SUR PETITION FOR REHEARING

### Dec. 18, 1990.

PRESENT: HIGGINBOTHAM, Chief Judge, and SLOVITER, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, and SEITZ, Circuit Judges.

The petition for rehearing filed by appellee in the above captioned matter having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in the regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Chief Judge Higginbotham and Judge Mansmann would grant rehearing by the court in banc for the reasons set forth in Judge Mansmann's dissent. Judges Scirica, Nygaard and Alito would grant rehearing by the court in banc.