**UNITED STATES of America, Plaintiff,**

v.

**LORANTFFY CARE CENTER,**
**et al., Defendants.**

**No. 5:97 CV 295.**

United States District Court,
N.D. Ohio,
Eastern Division.

March 24, 1998.

Barbara A. Burr, Gavin C. Dowell, Department of Justice, Washington, DC, for United States of America.

William G. Williams, Buckingham, Doolittle & Burroughs, Canton, OH, Karen M. Doty, Buckingham, Doolittle & Burroughs, Michele Morris, Christoff, Martin, Haskins & Morris, Akron, OH, for Lorantffy Care Center.

William G. Williams, Buckingham, Doolittle & Burroughs, Canton, OH, Mark J. Skakun, III, Karen M. Doty, Buckingham, Doolittle & Burroughs, John B. Schomer, Candace E. Campbell, Buckingham, Doolittle & Burroughs, Akron, OH, for Tibor Domotor, Elizabeth Schmidt, Betty Vargo.

Michele Morris, Christoff, Martin, Haskins & Morris, Akron, OH, for Elizabeth Domotor.

## ORDER

SAM H. BELL, District Judge.

## I. INTRODUCTION

Now before the court are cross-motions for summary judgment filed by the plaintiff, United States of America, (Docket # 45) and the defendants, Lorantffy Care Center ("LCC"), Tibor Domotor, Elizabeth Domotor, Elizabeth Schmidt and Betty Vargo (Docket # 47). The government filed this suit pursuant to the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601 *et seq.* (collectively "the FHA" or "the Act"). For the reasons that follow, the court finds that the government has standing to bring this suit, and that LCC is not exempt from the provisions of the Act. In addition, the court finds that the government is entitled to summary judgment on each of the following affirmative defenses: statute of limitations; disregard of procedural safeguards; res judicata and collateral estoppel; constitutionality of the FHA; laches, waiver and unclean hands; and illegality and invalidity. However, the court also finds that each of the individual defendants is entitled to judgment as a matter of law. This court has jurisdiction over this case under 28 U.S.C. § 1345 and 42 U.S.C. § 3614.

## II. STANDARD OF REVIEW

When considering motions for summary judgment, a court must generally establish whether the plaintiff can present evidence sufficient to support a reasonable verdict in its favor. As recently explained by the Sixth Circuit Court of Appeals,

[a] court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Under this test, the moving party may discharge its burden by "pointing out to the district

court ... that there is an absence of evidence to support the nonmoving party's case." The nonmoving party cannot rest on its pleadings, but must identify specific facts supported by affidavits, or by depositions, answers to interrogatories, and admissions on file that show there is a genuine issue for trial. Although [the court] must draw all inferences in favor of the nonmoving party, it [the non-moving party] must present significant and probative evidence in support of its complaint. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

*Hall v. Tollett,* 128 F.3d 418, 422 (6th Cir. 1997) (citations omitted). The court shall proceed with these standards in mind.

## III. BACKGROUND

In Copley, Ohio, there is a place where elderly immigrants from Hungary can enjoy the care and services of assisted living within a community of others with backgrounds similar to their own. That place is the Lorantffy Care Center. Tibor Domotor established LCC with the idea that Hungarian immigrants deserve a place of their own as they grow older and need care. Domotor knows first-hand the challenges of adjusting to life in a place far from one's native land. In 1956, he fled Hungary as revolutionaries challenged the totalitarian government backed by the Soviet Union. He came to the United States as a minister of the Free Hungarian Reformed Church. After ministering to other Hungarian immigrants in northern Ohio, he came to Copley in 1966 to serve as Minister of the Christ Reformed Church. (Tibor Domotor Dep. at 13, 29–30.)

In 1971, Reverend Domotor established the LCC with the support of his church's council and congregation. LCC, a non-profit corporation, maintained a legal identity separate from the church. (*Id.* at 31.) But it has always maintained close ties with the church from which it sprung. Church members gave the $200,000 needed to build LCC. (*Id.* at 43–45.) The church and LCC share physical and personnel resources, and LCC gives

church members first priority in securing beds in its facility. LCC's charter provides that if LCC ever ends its operations, the church will receive all of its assets and claims. (*Id.* at 46–50.)

While all of this appears to be admirable, the government contends that it is not admirable in all respects. In particular, the government asserts that LCC has engaged in a pattern and practice of discrimination against applicants for its services simply because those applicants were African–Americans. This, the government argues, violates both the letter and the spirit of the FHA.

The government reached its conclusion after conducting various tests at LCC between March and July, 1995.[1] Using eleven individuals in all, it sent groups of testers to LCC posing as persons interested in admitting an elderly relative. The government wanted to see whether LCC and its employees were treating blacks and whites differently when they asked about a securing a LCC bed. In each test, a black tester and a white tester would visit LCC separately on behalf of a similarly-situated relative. Each asked about current availability, and how long it would take for a space to become available. These conversations were recorded on audio tape, and then compared to determine whether or not LCC employees gave less favorable service or treatment to the black testers. (*See, e.g.*, Pl.'s Ex. 4.)

After reviewing the tapes, the government decided that black testers did receive inferior treatment. They found that in different tests, black testers were consistently told of longer waiting periods and longer waiting lists. Black testers were also less likely to be asked to give a phone number so that a LCC employee could call if a bed became available. None of the white testers represented that they were of particular European or Hungarian ancestry, or belonged to any particular church.

The government also uncovered various statements made by Reverend Domotor and other LCC staff. The government charges that the statements further reveal a hostility towards the admission of blacks at LCC. For example, Gerri Basso, a former Director of Social Work at LCC, recalled comments made by Domotor after an African–American woman inquired about admitting a family member. According to Basso, Reverend Domotor commented said that while the woman was "obviously educated" or "obviously more cultured," LCC did not "want to start that here." (Basso Dep. at 63–66.) Basso also testified about an occasion when Defendant Betty Vargo spoke to a prospective applicant on the telephone. After Vargo hung up, Basso contends, she commented that the caller "sounded black" and that "we don't want any of those." (*Id.* at 57–58.) Basso further testified that Defendant Elizabeth Schmidt confirmed to other LCC employees that LCC did not want to start admitting black residents. (*Id.* at 62–63.)

Based on such information, the government filed the instant suit against LCC and four individuals associated with the facility: Reverend Domotor, Elizabeth Domotor, Elizabeth Schmidt and Betty Vargo. In its complaint, the government alleges that the defendants: (1) refused to rent or make available a dwelling because of race or color, in violation of 42 U.S.C. § 3604(a); (2) made or published statements in connection with the rental of a dwelling that shows an intention to discriminate on the basis of a race or color, in violation of 42 U.S.C. § 3604(c); (3) represented to individuals based on their race or color that available dwelling units were not available, in violation of 42 U.S.C. § 3604(d). As a result of their actions, the government contends, the defendants are liable for: (1) a pattern or practice of resistance to the full enjoyment of rights granted under the Fair Housing Act; and (2) a denial to a group of persons of rights granted by the Act.

The defendants vehemently deny the government's charges. After a year of some-

---

1. Defendants assert the government's entire investigation stemmed from a tip the Fair Housing Contact Services ("FCHS"), an anti-discrimination advocacy group. FCHS is no stranger housing discrimination litigation in this Circuit. In *Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir. 1993), the Sixth Circuit Court of Appeals noted that "FCHS is an organization that works to eliminate discriminatory housing practices."

times contentious discovery, the parties have all moved summary judgment on one or more issues. The court shall consider each in turn.

## IV. *LAW AND ANALYSIS*

▮ The Fair Housing Act prohibits discrimination based on race or color in the sale or rental of any dwelling. "[I]t shall be unlawful [t]o refuse to . . . make available or deny, a dwelling to any person because of race or color." 42 U.S.C. § 3604(a) (West 1998). The Act was passed to "assure every American a full opportunity to obtain housing for himself and his family free from any discrimination on account of race, color, religion or national origin." H.R. Res. 16340, 90th Cong., 2d Sess., 114 Cong. Rec. 8, 407 (1968).[2] Discrimination under the FHA may take one of two forms: intentional discrimination or discriminatory effect. *Arthur v. City of Toledo,* 782 F.2d 565, 574 (6th Cir.1986). This case is about whether the defendants intentionally discriminated against applicants because of their race. To establish discriminatory intent, a Fair Housing Act plaintiff does not have to show that a defendant was only motivated by race. Instead, the plaintiff need only prove that race was one effective reason for the defendant's actions. *Green v. Century 21,* 740 F.2d 460, 464 (6th Cir.1984).

▮ Although developed for employment cases under Title VII, the burden shifting framework of *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972) and *Texas Dept., of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) applies in housing discrimination cases under the FHA. *Selden Apartments v. HUD,* 785 F.2d 152, 159 (6th Cir.1986). That framework requires that a plaintiff first establish a prima facie case of housing discrimination. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. At that point, the burden then shifts

back to the plaintiff to show that the articulated reason is merely pretextual. *Id.*

### A.

▮ The court must begin, however, with the issue of standing. Standing is simply the right of a party to assert a claim. "In essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Standing is not a mere technicality or procedural hurdle. It is a basic question of constitutional law. The Constitution requires that federal judicial power extend only to live "cases or controversies." *See* U.S. Constit. Art. III, § 2. Absent standing, there is no such case or controversy, because the plaintiff has no right even to present his claims to the court. *See Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 1067, 137 L.Ed.2d 170 (1997) ("Article III, § 2 of the Constitution confines federal courts to the decision of 'cases' or 'controversies.' Standing to sue or defend is an aspect of the case or controversy requirement.").

In most cases which consider standing, the party raising the issue is the government. A plaintiff, usually a public interest organization, challenges the lawfulness of a government action, and the government argues that the organization lacks standing to bring its challenge. For example, in *Arizonans for Official English,* a state employee sued the State of Arizona to challenge the State's policy on language in the workplace. *Id.* at 1060. Subsequently, an organization intervened which had sponsored a language amendment to the state constitution. The government then argued, successfully, that the organization lacked standing to appeal the district court's ruling. *Id.* at 1063.

▮ This case, however, is different. Here, the government challenges the lawfulness of actions taken by a private corporation, and the corporation argues that it is the government which lacks standing. At least

---

**2.** In 1988, Congress amended the Act to prohibit housing discrimination based an individual's dis-

ability or family status.

one appellate court has found that the doctrine of standing does not apply in such nontraditional circumstances. *See FDIC v. Bachman*, 894 F.2d 1233, 1235–36 (10th Cir. 1990) ("Standing pertains to suits brought by individuals or groups challenging governmental action which has allegedly prejudiced their interests."). Our Circuit, however, has taken a different view. In *DeMarco v. Ohio Decorative Prods., Inc.*, No. 92–2254, 1994 WL 59009, *14 n. 14 (6th Cir.1994) (unpublished), Judge Engel considered the general issue of whether the doctrine of standing applies in nontraditional circumstances. After reviewing all relevant Circuit case law, he found that the doctrine does apply. In particular, he noted that the Sixth Circuit Court of Appeals has even applied the doctrine of standing to private commercial suits which do not involve the government at all. *Id.* at *15 (Engel, J., concurring) ("The standing doctrine [Plaintiff] DeMarco urges, relates only to the public law context; Rule 17, on the other hand, is implicated in suits between private parties.... Notwithstanding DeMarco's claim that standing is generally considered a public law concept, we have previously found the doctrine to be applicable in suits like this one presently before the court.") (citing *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir.1988)). Thus, the court must apply the standing doctrine in this case, despite the nontraditional character of the application.

 Nevertheless, there is little for the court to apply. Defendants assert only a limited challenge to the government's standing. Specifically, they argue only that the government lacks standing to challenge certain advertisements made by LCC. "The government complains that certain advertisements of LCC are racially discriminative and therefore in violation of the Act." (Defs.' Joint Mot. for Summ. J. at 21.) The court, however, finds no such challenge to LCC's advertising anywhere in the complaint, and Defendants do not cite to any particular pro-

visions. It is the complaint that defines the claims raised in any case, including this one. *Cf. Florida Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 706, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982) (White, J., concurring in part and dissenting in part) ("It is the complaint which defines the nature of an action ...."). In this case, the complaint does not include the advertising claim that is the subject of the defendants' argument. Therefore, the court finds Defendants' argument to be moot.[3]

### B.

The court next considers whether the defendants are subject to the FHA. As discussed above, Congress passed the FHA to "provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601 (West 1998). Nevertheless, the Act specifically exempts certain housing decisions from its requirements. The defendants argue that one such exemption applies in this case. As a result, they conclude, they are not subject to the Act at all, and must be granted judgment as a matter of law.

 At all times, LCC, not the government, bears the burden of proving that it is exempt from the Act. *Chapman v. Dunn*, 414 F.2d 153, 159 (6th Cir.1969); *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 188, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985). Defendants specifically claim that LCC is exempt from the Act under the so-called "religious organization exemption." That exemption provides, in pertinent part, that

> nothing in this subchapter shall prohibit a religious organization, association, or society, or any nonprofit institution or organization operated, supervised or controlled by or in conjunction with a religious organization, association, or society, from limiting the sale, rental or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion, or from giving prefer-

---

**3.** The court appreciates that standing is a matter of jurisdiction. Thus, the court must always be satisfied that the plaintiff has standing to bring its claims, regardless of the scope of the challenge brought by the defendants. *See, e.g., O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669,

38 L.Ed.2d 674 (1974). Nevertheless, because it is generally satisfied that the government has standing to bring its claims, the court addresses only the challenge raised by the defendants in their memoranda.

ence to such persons, unless membership in such religion is restricted on account of race, color, or national origin.

42 U.S.C. § 3607(a) (West 1998). Thus, to qualify for this exemption, an defendant must be either: (1) a religious organization, or (2) a non-profit organization sufficiently affiliated with a religious organization.

■ The government does not concede that LCC is exempt as a religious organization. (*See* U.S. Opp. to Joint Mot. for Summ. J. at 17 n. 2). But it focuses its argument instead on the scope of the exemption, even if LCC does qualify. The government first notes that the exemption permits qualified religious organizations only to prefer members of the religion over non-members. The exemption does not, it continues, permit a religious group to prefer non-blacks to blacks when it selects from among those individuals whose religious identity is unknown. The government then notes that, in its complaint, it specifically claims that LCC gave preferential treatment to non-blacks over blacks, without considering whether the non-blacks were members of the Reformed Christ Church. As a result, the government concludes, the exemption simply does not apply in this case.

■ The court agrees. First, the court must always construe any exemption to the Act narrowly. *Elliott v. City of Athens*, 960 F.2d 975, 978 (11th Cir.1992) (citing *United States v. Columbus Country Club*, 915 F.2d 877, 883 (3d Cir.1990); *United States v. Hughes Memorial Home*, 396 F.Supp. 544, 550 (W.D.Va.1975)). Second, when Congress considered the FHA, it recognized that the Act might impose an undue burden on various religious organizations which, without any discriminatory animus, merely sought to provide housing for its members. Thus, Congress made it clear that these organizations could, under certain circumstances, give preference to their members, without any fear of liability under the Act. This is not, however, the liability which the government charges in its complaint in this case. Here, the government charges that LCC did not take its applicants' religious, or even ethnic, membership into account at all. It further charges that among

this non-selected group, LCC preferred non-blacks to blacks. Consequently, it is irrelevant to this case whether LCC is entitled to the exemption, because the exemption is limited to actions which are not the subject of the government's challenge.

### C.

The government has standing to bring all its claims. Under the circumstances before the court, LCC is not exempt from the provisions of the Act. Therefore, the court shall next consider whether Defendants are entitled to summary judgment on the merits of the government's claims. The defendants first argue that the government did not appropriately test LCC's procedure for admitting residents, and that even if it did, none of the individual defendants in this case may be held liable under the Act. The court agrees, but only in part.

■ In *Havens Realty Corp. v. Coleman*, the Supreme Court discussed the role of "testers" in ferreting out racial discrimination in housing. The plaintiff in *Havens* brought a class action suit under the FHA against the owner of an apartment complex for its practice of steering applicants according to their race. The Court initially noted the importance of controlled testing. It then held that testers even had standing under the Act to bring claims in their individual capacity, despite the fact that they had no actual interest in purchasing or renting a dwelling. "In the present context, testers are individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices.... A tester who has been the object of a misrepresentation made unlawful ... has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions." *Havens Realty Corp.*, 455 U.S. at 373–4. Other courts have similarly found that "[i]t would be difficult indeed to prove the discrimination in housing without this means of gathering evidence" and that "the evidence provided by testers is frequently valuable, if not indispensable ...." *Hamilton v. Miller,*

477 F.2d 908, 910 n. 1 (10th Cir.1973); *Richardson v. Howard*, 712 F.2d 319, 321 (7th Cir.1983). While conceding that testing is not in itself impermissible, Defendants note that the testers in this case simply walked into LCC and asked about bed availability. They then note that most residents at LCC are referred by a hospital and carefully assessed to make sure that they are medically suitable for care at LCC. As a result, Defendants conclude, the tests were not at all representative of the actual admissions process, and reveal nothing about any discriminatory intent in the admission process.

■ This conclusion misses the broader purpose of the FHA. Clearly, the Act prohibits discrimination in the sale or rental of a dwelling, including the admission of residents to a nursing home. *Cf. Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1102 (3rd Cir.1996) (holding that a nursing home is a "dwelling" under the terms of the FHA). But it also recognizes that decisionmakers can discriminate against applicants long before they reach the point of deciding whether to accept an application. They may discriminate in how they solicit and encourage applications. They may discriminate in how they treat applicants who ask questions about the dwelling, and in the process by which they inform applicants about a residency opening. They may also discriminate in the terms of residency which they offer to an otherwise successful applicant. All of these actions might discourage an interested person from pursuing an application to the point of ultimate decision. Consequently, these actions might be just as effective in limiting housing opportunities for members of a protected group as any policy which ultimately turns them away on the basis of their group membership.

Defendants may be accurate in that LCC does not usually admit residents on the basis of a walk-in inquiry. They also may be accurate in that the government offers no evidence that LCC unlawfully discriminates in admitting residents from hospital referrals, its usual practice. However, the government does offer sufficient evidence that LCC engaged in a pattern and practice of treating black "walk-ins" less favorably than their white counterparts. If true, this clearly violates the FHA. Therefore, the court finds that the government may proceed in its claims against LCC.

■ Nevertheless, the government may not maintain its claims against the individual defendants. First, the government attempt to hold the individuals liable for the pattern or practice of discrimination it alleges exists at LCC. The court acknowledges the government's right to challenge "the illegal activities of a group of persons even if the individual members of the group of persons were not engaged in an individual pattern or practice." *United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115, 123 (5th Cir.1973). However, that right is limited. In particular, no individual may be held vicariously liable for a company pattern or practice simply because she is an officer or manager of the company. In *Marr v. Rife*, 503 F.2d 735, 741 (6th Cir.1974), the Sixth Circuit did find that a company is liable for the acts and statements of its employees. But in that decision, and those within the Circuit that follow it, courts apply the doctrine of vicarious liability to the company, not the company's individual officers. *See, e.g., Heights Comm. Congress v. Hilltop Realty, Inc.*, 629 F.Supp. 1232, 1303 (N.D.Ohio 1983), *rev'd in part on other grounds*, 774 F.2d 135 (6th Cir.1985) ("A broker under contract with its agents has a nondelegable duty to obey the Fair Housing Act. *Marr v. Rife*, 503 F.2d at 741. Thus, [Defendant] Hilltop Realty is liable for the imputed acts and statements of those agents who participated in the eight violations of section 3604(a) and the sections 3604(c) and (e) violations found by this court. However, since the sales agents in those violations have a contractual relationship with Hilltop as broker and not with [Hilltop President] Vincent T. Aveni as broker, their acts and statements may not be imputed to him under *Marr v. Rife*.").

Second, the government does not allege that each individual himself engaged in a pattern or practice of discrimination. This would, of course, be actionable. But in its complaint, the government alleges only a discriminatory practice and pattern by LCC as a whole. (Comp.¶ 13.) Further, in its mem-

oranda, the government again asserts only a general discrimination pattern. (See, e.g., United States' Opp. to Joint Mot. for Summ. J. at 21 ("Furthermore, the United States has evidence linking each named Defendant to the resulting pattern or practice of discrimination.")). As a result, the court shall dismiss all claims against Tibor Domotor, Elizabeth Domotor, Elizabeth Schmidt and Betty Vargo.

### D.

Finally, the court must consider the government's challenge to other affirmative defenses offered by the defendants in their answer. Those defenses include: statute of limitations; disregard of procedural safeguards; res judicata and collateral estoppel; constitutionality of the FHA; laches, waiver and unclean hands; and illegality and invalidity. The government argues that the defendants have not met their burden under Fed. R. Civ. Pro. 56 of identifying "specific facts supported by affidavits, or by depositions, answers to interrogatories, and admissions on file that show there is a genuine issue for trial." Hall, 128 F.3d at 422.

 The government is correct. The defendants do not even address the defenses of laches, waiver, unclean hands, illegality and invalidity, or constitutionality, beyond generally asserting that "[t]hese defenses relate to the common thread that runs through the manner in which these claims against LCC have been prosecuted by the government." (Defs.' Resp. to Pl.'s Mot. for Summ. J. at 8.) As for the defenses that the government has violated the statutes of limitations and disregard procedural safeguards, Defendants similarly fail to meet their burden. The defendants assert that the Attorney General pursued this case after it was referred to the Department of Housing and Development ("HUD"). Consequently, they argue, the government owes them a duty to adhere to certain time limits and procedures. See 42 U.S.C. § 3610(a) (West 1998); 24 C .F.R. § 102.200 et seq. (West 1998). However, this argument ignores the Attorney General's clear and independent authority to initiate a suit under 42 U.S.C. § 3614(a). Under this authority, the Attor-

ney General is not required to afford a civil defendant the same protections as are afforded a target of a HUD investigation under 42 U.S.C. § 3610(a). Moreover, there is no requirement that the Attorney General refrain from pursuing a case under § 3614(a) once HUD has begun any investigation.

 Finally, the court finds that the doctrines of res judicata and collateral estoppel simply do not apply in this case. "Under res judicata doctrine, a judgment on the merits bars a second suit between the same parties or their privies based on the same cause of action." Aircraft Braking Systems Corp. v. Local 856, 97 F.3d 155, 161 n. 2 (6th Cir.1996) (citing Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)). Alternatively, "[t]he doctrine of collateral estoppel bars the same parties or their privies from relitigating in a second suit issues that were actually litigated and determined in a former suit." Smith v. Thornburg, 136 F.3d 1070, 1087 (6th Cir. 1998). Both doctrines, however, may only be applied against a party to a relevant earlier suit, or one in privity with such a party. Neither the Attorney General nor its privy has brought any action under the Act against LCC other than this suit. Therefore, the government is not subject to any limitation which these doctrines might otherwise impose.

### V. CONCLUSION

The court hereby GRANTS Plaintiff's motion for summary judgment, but only as to the following affirmative defenses: statute of limitations; disregard of procedural safeguards; res judicata and collateral estoppel; constitutionality of the FHA; laches, waiver and unclean hands; and illegality and invalidity. The court also GRANTS Defendants' motion for summary judgment, but only as to Plaintiff's claims against Defendants Tibor Domotor, Elizabeth Domotor, Elizabeth Schmidt and Betty Vargo.

IT IS SO ORDERED.