Sidney COHEN and Dorothy Cohen
and Susan Cohen, Plaintiffs,

v.

TOWNSHIP OF CHELTENHAM,
PENNSYLVANIA,

and

Zoning Hearing Board of Cheltenham
Township, Defendants.

No. 97–3978.

United States District Court,
E.D. Pennsylvania.

Nov. 15, 2001.

■■■■■■■■

---

Stephen A. Durham, Media, PA, for Plaintiff.

George H. Knoell, III, Norristown, PA, for Defendants.

### *MEMORANDUM*

DuBOIS, District Judge.

## I. INTRODUCTION

On June 11, 1997, the United States of America ("United States") filed a Complaint alleging that defendants, Township of Cheltenham ("Township") and the Zoning Hearing Board of Cheltenham Township ("Board"), denied Sidney Cohen's and Dorothy Cohen's petition for a zoning variance in violation of the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601 *et seq.* ("FHAA"). On July 11, 1997, Sidney Cohen and Dorothy Cohen moved to intervene as plaintiffs and were granted permission to do so by Order dated August 13, 1997. In December 1997, the United States' lawsuit against defendants was settled after the Township agreed to amend its zoning ordinance so as to provide for the granting of reasonable accommodations to handicapped individuals. Sidney Cohen and Dorothy Cohen maintained their lawsuit against defendants, and their daughter, Susan Cohen, was permitted to intervene by Order dated July 1, 1999. Sidney Cohen, Dorothy Cohen, and Susan Cohen ("plaintiffs") now seek declaratory, injunctive, and compensatory relief.

Presently before the Court are Defendants' Motion for Summary Judgment (Document No. 64, filed March 9, 2001) ("Defs.' Mot.") and Plaintiffs' Answer to Defendants' Motion for Summary Judgment and Plaintiffs' Cross Motion for Summary Judgment (Document No. 66, filed March 22, 2001) ("Pls.' Mot."). For the reasons set forth below, defendants' motion will be granted and plaintiffs' motion will be denied.

## II. FACTS

This case involves plaintiffs' efforts to sell their home in Elkins Park, Pennsylvania to Safe Haven for Children, Inc. ("Safe Haven"), a not-for-profit corporation which, according to plaintiffs, intended to convert the home into a residential facility, or group home, for abused, neglected, and abandoned children. Plaintiffs were unable to proceed with the sale, however, because defendants denied plaintiffs' application for the necessary zoning variance. Plaintiffs allege that defendants' denial of that application constituted a violation of the FHAA's provisions prohibiting discrimination on the basis of handicap. Specifically, plaintiffs argue that defendants violated the reasonable accommodations provision of the FHAA, 42 U.S.C. § 3604(f)(3)(B), which states that discrimination on the basis of handicap includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling."

The property in question is a five-bedroom, five and one-half bathroom home located at 8208 New Second Street in Elkins Park, Cheltenham Township, Pennsylvania. Pls.' Am. Compl. (Document No. 53, filed July 12, 1999) ("Compl.") at ¶ 7; *see also* Plan of the Cohen Residence, Record of the Zoning Hearing Board of Cheltenham Township ("R."), Ex. 5. It was owned by plaintiffs, Sidney Cohen and Dorothy Cohen from 1964 until January

1999 when it was sold at a sheriff's sale.[1] Sidney Cohen Dep. at 16–17.

The property is located in a residential zoning district designated "R4." Compl. at ¶¶ 6–7. Section 601 of the Cheltenham Township Zoning Ordinance of 1929, as amended, ("Zoning Ordinance") permits single-family residences as a matter of right in such "R4" areas. *Id.* at ¶ 6. Section 100(15) of the Zoning Ordinance defines "family" as either (1) any number of persons who are related by blood, marriage, or legal adoption; or (2) two or fewer unrelated persons sharing a house. *Id.* The Zoning Ordinance allows up to four unrelated persons to live in a single housing unit by special exception. *Id.* Witnesses testified before the Board that under the Township's Housing Code, a home the size of the Cohens' was large enough to accommodate up to sixteen related people. *See, e.g.,* Testimony of Daniel Lauber, R., Sept. 18, 1995, at 47–48.[2]

In 1995, plaintiffs, Sidney Cohen and Dorothy Cohen, entered into an agreement to sell their house to Dr. Ira Glazer, who agreed, in turn, to lease the house to Safe Haven. Compl. at ¶ 11. Some time later,[3] plaintiffs' agreement with Dr. Glazer and Safe Haven expired. *Id.* at ¶ 27. Susan Cohen, the daughter of Sidney Cohen and Dorothy Cohen, who has educational training and professional experience in the mental health field, then agreed to purchase the property and operate the group home. *Id.* Safe Haven, and, later, Susan Cohen, planned to use the house as a residential child care facility for up to ten abandoned, abused, and neglected children between the ages of five and nine. *Id.* at ¶ 8.

Plaintiffs' intended purpose was to create a "residential child care facility"[4] that provided a "normalized home-type environment for abused children." Testimony of Mary Riggs–Cohen, R., Sept. 18, 1995, at 134. The "structured, predictable environment" of the home would be aimed at meeting the emotional needs of the proposed residents. *Id.* at 136. Such an environment was central to the home's plan for treatment of the abused, abandoned, and neglected children as "frequently these type[s] of children have never had their emotional needs responded to at all." *Id.* Children would be admitted to the proposed home upon a physician's determination that such a facility was "medically necessary" for each abandoned, abused, or neglected child. Compl. at ¶ 8. As a means of treating the resident children, mental health workers would be available to provide services twenty-four hours a day. Testimony of Susan Cohen, R., Nov. 2, 1995, at 20. After arrival at the home, children would reside there for a period of time lasting up to nine or ten months, or, if necessary, longer. *Id.* at 39. While residing there, the children would be assigned chores in the home, eat to-

1. Plaintiffs originally sought injunctive relief compelling defendants to grant plaintiffs' requested zoning variance so they could sell their property to Safe Haven. Because plaintiffs no longer own their home, their claim for injunctive relief is rendered moot.

2. The transcripts of the Board's several hearings are not paginated consecutively. Accordingly, all citations in this Memorandum to the Board record will be designated by the date of the relevant transcript and the page number.

3. Plaintiffs do not specify a date in their Complaint.

4. The phrase "residential child care facility" is derived from Pennsylvania Department of Public Welfare regulations. *See* 55 Pa.Code § 3810.1 *et seq.* For purposes of this Memorandum, the Court will adopt the parties' practice of using this label interchangeably with the terms "group home" or "home."

gether as a family, and sleep in the home each night. *Id.* at 20–25.

In order to operate as a residential child care facility, plaintiffs required zoning approval. Accordingly, on June 30, 1995, plaintiffs filed an application with the Board requesting a zoning variance from the "R4" designation so as to allow up to ten children to reside in the home. Compl. at ¶ 13. The Board conducted a series of hearings concerning plaintiffs' application. In their application and throughout their presentation of evidence, plaintiffs argued that the Board was compelled to grant the variance under the FHAA. Specifically, plaintiffs argued that the abused, neglected, and/or abandoned residents of the proposed group home would be "handicapped" as that term is defined under the FHAA. *See* 42 U.S.C. § 3602(h). In light of the residents' handicapped status, plaintiffs argued, the Board was required to grant the variance under the FHAA's "reasonable accommodations" provision. 42 U.S.C. § 3604(f)(3)(B).

During the pendency of the proceedings before the Board, the Township Building and Zoning Committee, on which members of the Township Board of Commissioners sit, reviewed plaintiffs' application. *See* Pls.' Mot., Ex. 1. Ultimately, the Building and Zoning Committee voted to direct the Township Solicitor to appear before the Zoning Hearing Board and recommend denial of plaintiffs' application. *See id.*

On December 11, 1995, the Board issued an oral decision denying plaintiffs' request for a variance. Compl. at ¶ 15. On January 10, 1996, plaintiffs filed a Notice of Appeal with the Court of Common Pleas of Montgomery County. On April 16, 1996, plaintiffs filed with the Secretary of the Department of Housing and Urban Development ("HUD") a complaint alleging housing discrimination by defendants on the basis of handicap. *Id.* at ¶ 20. Under 42 U.S.C. § 3610(g), the Secretary of HUD referred the matter to the Department of Justice. *Id.* On June 11, 1997, the Attorney General, pursuant to 42 U.S.C. § 3614(b)(1)(A), brought an action on behalf of the United States against defendants. *Id.* at ¶ 21. On October 24, 1997, plaintiffs Sidney Cohen and Dorothy Cohen filed a complaint in intervention against defendants pursuant to 42 U.S.C. § 3614(e).

The United States subsequently entered into a settlement agreement with defendants in December 1997 and withdrew its suit against defendants. *Id.* at ¶ 24. The terms of that agreement required defendants to enact new zoning legislation authorizing the Board to grant reasonable accommodations as provided for in 42 U.S.C. § 3604(f)(3)(B), and defendants did so. *Id.*

On June 2, 1998, plaintiffs applied for a reasonable accommodation under the new zoning ordinance, seeking, as they did in their first application to the Board, a variance from the "R4" designation so as to allow ten unrelated abused, abandoned, or neglected children to reside in the proposed group home. Compl. at ¶ 25. The Board conducted a second series of hearings on plaintiffs' application and, on October 19, 1998, again, denied plaintiffs' application. *Id.* at ¶ 29.

In both sets of hearings before the Board, plaintiffs offered evidence concerning what they argue to be the handicapped status of the children who would reside in the group home. Plaintiffs' expert, Mary Riggs–Cohen, who has a doctorate in clinical psychology, testified that abused, abandoned, or neglected children might suffer from a number of physical or mental impairments that would substantially limit the children's major life activities. Testimony of Mary Riggs–Cohen, R., September 18, 1995, at 134–35. According to Dr.

Riggs–Cohen, these impairments may include an inability to relate with other people, excessive fear and anxiety, sleep disturbances, eating problems, problems with bed wetting, low self esteem, and learning disabilities. *Id.* at 135, 137. Plaintiff Susan Cohen stated that she believed every child in the facility would have an impairment limiting a major "life function." Testimony of Susan Cohen, R., August 10, 1998, at 16. Specifically, Cohen explained that the residents of the home would have mental health disabilities rendering them in need of "intense, therapeutic and clinical interventions." *Id.* at 14–16. Of all the possible impairments potentially suffered by the proposed residents, the "primary" impairment would be "in their ability to establish and maintain relationships with other people, adults or their peer group." Testimony of Mary Riggs–Cohen, R., September 18, 1995, at 135. Defendants' expert, Bertram Ruttenberg, a board-certified child psychiatrist, admitted on cross examination that abandonment or neglect of a child amounts to a trauma that "can cause emotional disturbance and interfere with cognitive and social functioning." Testimony of Bertram Ruttenberg, R., November 2, 1995, at 135. Significantly, none of this testimony concerned the handicapped status of specific children who would reside in plaintiffs' proposed home.

After consideration of the record from both the 1995 hearings and 1998 hearings, on October 19, 1998, the Board issued written Findings of Fact and Conclusions of Law setting forth its decision to deny plaintiffs' requested accommodation. The Board based the denial of plaintiffs' application on three conclusions relevant to the instant matter: (1) the proposed residents of the group home are not "handicapped" under 42 U.S.C. § 3602(h); (2) the proposed group home is not a "dwelling" as that term is used throughout 42 U.S.C. § 3604; and (3) plaintiffs "failed to meet

their burden in establishing the basis for a grant of reasonable accommodation or any other relief pursuant to the Ordinance." Defs.' Mot., Ex. I.

Plaintiffs subsequently filed a second Notice of Appeal with the Court of Common Pleas of Montgomery County. On December 30, 1998, plaintiffs withdrew both of their appeals before that court and continued to pursue their action before this Court.

While plaintiffs' request for a variance was pending, in September of 1998, plaintiffs Sidney Cohen and Dorothy Cohen filed a petition for bankruptcy under Chapter 7 of the Bankruptcy Code. Sidney Cohen Dep. at 26–27. Ultimately, as a result of the bankruptcy proceedings, their home at 8208 New Second Street was sold at a sheriff's sale in January 1999. *Id.* at 17. During the bankruptcy proceedings the Cohens did not attempt to sell their home as a residence because they "hoped that [they] would get the zoning through" and be able to use the proceeds from the sale of the property as a group home to settle their financial debts. *Id.* at 39. Plaintiffs allege that "[h]ad the sale of the property been allowed to go through ... the Cohens would have been able to clear all debt on the property, avoid their bankruptcy, and pay all past due taxes, as well as make a small profit." Pls.' Mot. at 5. Plaintiffs now seek damages to compensate them for these alleged losses.

### III. STANDARD OF REVIEW

"If the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[,]" summary judgment shall be granted. Fed.R.Civ.P. 56(c); *see also Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Supreme Court has explained that Rule 56(c) requires "the threshold inquiry of determining whether there is the need for a trial [5]—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, "a motion for summary judgment must be granted unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring) (citing *Anderson* and *Celotex Corp.*).

In considering a motion for summary judgment, the evidence must be evaluated " 'in the light most favorable to the non-moving party.' " *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). The party opposing summary judgment, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Therefore, "[i]f the evidence [offered by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). On the other hand, if reasonable minds can differ as to the import of the proffered evidence that speaks to an issue of material fact, summary judgment should not be granted.

■ This case involves an additional issue concerning standard of review: what deference, if any, this Court owes to the Board's findings of fact and conclusions of law. Defendants argue that because the Board has already considered the entire record now before the Court and because the Board applied a local ordinance with standards mirroring those of the FHAA, the Court should defer to the Board's findings of fact and conclusions of law. Specifically, defendants ask the Court to apply the "substantial evidence" standard in the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B)(iii) ("TCA"). That Act provides guidelines for how lo-

5. The Court notes that the parties have entered into a stipulation (Document No. 67, filed April 12, 2001) providing "that the record of the Cheltenham Zoning Hearing Board regarding plaintiff's [*sic*] application ... shall be accepted by all parties as the complete and exclusive record to be considered by the Court in ruling upon pre-trial motions and at the trial of this matter, with respect to all liability issues." Because the parties do not intend to present any additional evidence regarding liability, the parties, through counsel, informed the Court during an October 10, 2001 telephone conference that they expected the Court, based on its review of the stipulated record and the parties' summary judgment filings, to rule on liability, and, if necessary in so ruling, to decide all fact questions.

Because the Court does not find any factual disputes which require resolution, the Court's decision is based solely on legal conclusions.

As an aside, the Court also notes that the language of the stipulation directly contradicts the parties' intentions voiced during the October 10, 2001 telephone conference. The stipulation states that "[i]t is the understanding of the parties that this Honorable Court will rule upon all pre-trial motions and will base its ruling regarding liability *at trial* upon the record of the Cheltenham Zoning Board." (Emphasis added.) Not until the October 10, 2001 telephone conference did the parties make clear their desire for a ruling on liability based on the summary judgment filings as opposed to a presentation of the stipulated record at trial.

cal zoning authorities must deal with requests to construct wireless telecommunications facilities. It requires a zoning board's denial of permission to build such a facility to be "in writing and supported by substantial evidence contained in a written record." *Id.* Defendants advance their argument by saying there is substantial evidence in the record to support the Board's finding that (1) the proposed residents of plaintiffs' group home are not "handicapped" under the FHAA, and (2) the proposed group home is not a "dwelling" under the FHAA.

Defendants supply no authority supporting their argument that the substantial evidence standard of the TCA should apply under the FHAA. In fact, defendants make nothing more than a conclusory statement that because the standard applies in one context it should apply in the other. The Court concludes that defendants' argument is simply without merit; the substantial evidence standard *does not* apply in this FHAA case.

The question then becomes what standard this Court should employ in reviewing the Board's findings—whether the Court owes the Board's findings some deference, or whether the Court conducts a *de novo* review of the factual record. This is a question that has not received a great deal of attention. The statute is silent on the matter and very few courts have dealt with the issue.[6] One court that has considered the question—albeit tangentially—has pointed out that an action in federal

court under the FHAA is "not a review of an administrative decision made below, such that th[e] court reviews the … decision for abuse of discretion and considers only the evidence submitted to the administrative body." *United States v. City of Chicago Heights,* 161 F.Supp.2d 819, 830 (N.D.Ill.2001). Rather, the court concluded, "a district court action challenging a zoning decision under the FHAA is a *de novo* proceeding." *Id.*

Following the reasoning of the *Chicago Heights* court, this Court will give no deference to the Board's findings. It will conduct an independent *de novo* review of the factual record. This conclusion is based on an analysis of the nature and purpose of the FHAA.

When plaintiffs requested their variance from the Board, they argued that the Board was bound by the FHAA. The Board disagreed, finding that plaintiffs had not met two threshold requirements of the Act. Plaintiffs then filed an action in this Court under the provisions of the FHAA, seeking review of the Board's action. If federal courts were required to defer to municipal defendants' findings in zoning proceedings, district court review would be rendered a nullity. Given "that the enactment of the FHAA was 'a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream'" to be enforced by federal courts, *Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096, 1105 (3d Cir.1996) (quoting *Hel-*

---

**6.** The Court notes that the infrequent consideration of this issue may be related to the unique posture of this case where the parties have agreed to proceed solely on the Board record. In most cases like that presently before the Court where a plaintiff sues a local zoning board under the FHAA, the parties provide additional evidence in the federal court action. *See ReMed Recovery Care Ctrs. v. Township of Willistown,* 36 F.Supp.2d 676,

686 n. 8 (E.D.Pa.1999) ("Although ReMed apparently did not present this evidence to the Board, this court is not limited to consideration of the record before the Board and may consider new evidence presented by either party."). If the parties present additional evidence, the standard of review can be nothing but *de novo,* hence, the lack of consideration of this issue in reported case law.

*en L. v. DiDario,* 46 F.3d 325, 333 n. 14 (3d Cir.1995) (internal citations omitted)), the Court will not adopt an analysis that extracts the teeth from federal review of the conduct of a zoning board.

Defendants attempt to distinguish *Chicago Heights* by pointing to the stipulation limiting the record in this case, a scenario not present in the *Chicago Heights* case. This argument suggests that the appropriate standard of review turns solely on the admission of new evidence—that is, if either party were to submit evidence on liability not previously presented to the Board, the standard of review would change from substantial evidence to *de novo.* The Court rejects that reasoning. The mere fact of a limited record does not eliminate the underlying purpose of the FHAA to provide federal review for plaintiffs alleging discriminatory housing practices.

The Court concludes that the proper standard of review under the FHAA is *de novo* review. Therefore, the Court will not adopt the Board's findings of fact or its conclusions of law. Instead, the Court will conduct an independent review of the Board record.

## IV. DISCUSSION

At the outset, the Court notes that because plaintiffs no longer own the home at 8208 New Second Street, their claim for injunctive relief is rendered moot. The

Court will, therefore, grant defendants' motion on this claim for injunctive relief.

Defendants raise six arguments in support of their motion for summary judgment on plaintiffs' claim for compensatory relief: (1) the Court should abstain from exercising jurisdiction over plaintiffs' claim; (2) plaintiffs' claim is not ripe; (3) neither the Board nor the Township are proper defendants; (4) defendants are entitled to sovereign immunity under the Eleventh Amendment to the United States Constitution; (5) the proposed group home is not a "dwelling" under the FHAA; and (6) plaintiffs have not shown that the proposed residents of the group home are "handicapped" under the FHAA.[7] Plaintiffs have responded to each of the above arguments, and, in addition, assert that defendants' denial of plaintiffs' requested zoning variance violated the reasonable accommodations provision of the FHAA.

The Court rejects defendants' first five arguments. On defendants' sixth argument, however, the Court finds that plaintiffs have produced no evidence that the proposed residents of their group home would be handicapped. Accordingly, as a matter of law, plaintiffs' FHAA claim against defendants must fail. Although the Court grants defendants' motion based on its evaluation of the handicap issue, the Court must address each of defendants' first five arguments because they concern the procedural propriety of the Court's

---

7. Defendants make one additional argument that plaintiffs have failed to provide a date on which the Secretary of Housing and Urban Development elected to commence suit against defendants pursuant to 42 U.S.C. § 3612(*o*)(1). Defendants argue that because plaintiffs have not established that the Attorney General commenced suit within thirty days of this election, as required by § 3612(*o*)(1), plaintiffs' claim should be dismissed. The Court rejects this argument on the ground that the election provision applies only to a suit filed by the Attorney General. Plaintiffs' claim is the result of their intervention in a suit brought by the United States. Defendants provide no support for the proposition that private plaintiffs who have intervened in a suit brought by the Attorney General must comply with § 3612(*o*)(1). *See United States v. Forest Dale, Inc.,* 818 F.Supp. 954, 965 (N.D.Tex.1993) (referring in discussion of the FHAA's election provision only to suits filed by the Attorney General).

consideration of the merits of plaintiffs' claim.

## A. There are No Grounds for Abstention.

Defendants argue that the Court should decline to exercise jurisdiction over plaintiffs' claim under any of the Supreme Court's decisions in three seminal abstention cases: *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); and *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The Court concludes that none of the three abstention doctrines embodied in these cases applies in this instance.

### 1. *Burford* Abstention

 *Burford* abstention is appropriate where federal review of state administrative proceedings would have a "disruptive effect on state policy." *Colorado River*, 424 U.S. at 815, 96 S.Ct. 1236. As the doctrine has evolved, courts have held that a federal court sitting in equity should decline to interfere with state administrative agencies' proceedings or orders under two conditions: "(1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Keeley v. Loomis Fargo & Co.*, 183 F.3d 257, 273 n. 13 (3d Cir.1999) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (internal quotations omitted)).

Defendants argue that because the Board is established in accordance with the Commonwealth of Pennsylvania's Municipalities Planning Code, 53 Pa. Cons. Stat.Ann. § 10101 *et seq.*, federal review of the Board's actions "would disrupt the state court effort to establish a coherent policy regarding the application of FHAA standards to land use and zoning matters." Defs.' Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") at 40. However, defendants point to no authority supporting this argument. Nor do defendants address the Third Circuit's decision in *Izzo v. Borough of River Edge*, 843 F.2d 765 (3d Cir.1988), in which the court reversed a district court's decision to abstain under *Burford* from hearing a federal challenge to a local zoning regulation.

Plaintiff in *Izzo* was an amateur radio operator with a Federal Communications Commission license who sought to install a forty-foot radio tower in his backyard. *Id.* at 766. Because the local zoning ordinance limited the height of such structures to thirty-five feet, the plaintiff sought a variance from the defendant zoning board. *Id.* After the zoning board denied the variance, the plaintiff filed a complaint in district court raising constitutional claims. *Id.* The district court abstained, following *Burford*, reasoning that exercising jurisdiction over the controversy would " 'result in needless federal-state friction.' " *Id.* (quoting trial court's opinion).

In reversing the abstention decision in *Izzo*, the Third Circuit adopted a three-pronged analysis for evaluating the propriety of invoking *Burford* abstention in cases involving a federal issue (as does the present case). The court posited that, in order for a court to abstain, (1) the state regulation(s) should "be of significant and special concern to the state"; (2) the regulatory scheme should "be detailed and complex"; and (3) the federal claims

should be "unresolvable without requiring the district court to immerse itself in the technicalities of the state's scheme." *Id.* at 769 (citing M. Redish, *Federal Jurisdiction: Tension in the Allocation of Judicial Power* 246 (1980)). Finding none of these conditions present, and reasoning that the case before it "threaten[ed], at most, only a minimal disruption of a broad state policy," the court concluded that *Burford's* rationale was not apposite, and "the general obligation of federal courts to retain jurisdiction of matters entrusted to them, particularly on matters of federal law, predominat[ed]." *Id.*

The Court concludes that the analysis in *Izzo* compels the same result in this case. Plaintiffs in this case challenge only one decision of the defendant zoning board—a decision that impacts only one tract of property in a large township. The "minimal disruption of a broad state policy" engendered by federal review of the Board's decision does not rise to the level of interference contemplated in the *Burford* line of cases.

### 2. *Younger* Abstention

■ Defendants next argue that the Court should abstain under the *Younger* doctrine, which, following notions of comity between the federal and state systems, counsels district courts to abstain from cases implicating ongoing or pending state judicial proceedings. In addressing defendants' argument, the Court finds persuasive Judge Shapiro's decision in *ReMed Recovery Care Ctrs. v. Township of Worcester*, No. 98–1799, 1998 WL 437272 (E.D.Pa. July 30, 1998) ("*ReMed I*"). In *ReMed I*, plaintiff ReMed operated a group home for handicapped persons with brain injuries, autism, and other disabilities. *Id.* at *1. Upon receiving notification that its housing of three unrelated males violated governing zoning provisions

limiting housing to two unrelated individuals, ReMed applied for an exception to that zoning ordinance. *Id.* The defendant zoning board denied the application. *Id.* at *2. ReMed then filed an action in the Court of Common Pleas of Montgomery County and filed a complaint in district court alleging a violation of the FHAA. *Id.* In rejecting defendant's argument that the court should decline to exercise jurisdiction, Judge Shapiro explained that *Younger* abstention is "inappropriate if the state proceedings are 'remedial,' rather than 'coercive.'" *Id.* at *2 (citing *Ohio Civil Rights Comm'n v. Dayton Christian Sch.*, 477 U.S. 619, 627 n. 2, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (other citations omitted)).

In the first instance, the Court notes that in contrast to *ReMed I*, plaintiffs in this case have withdrawn their state court action. This effectively ends the *Younger* abstention inquiry because there are no state proceedings. *See Bass v. Butler*, 258 F.3d 176, 179 (3d Cir.2001) (noting that *Younger* abstention only applies to "ongoing" proceedings).

■ Defendants argue, however, that proceedings are still pending because plaintiffs may still file an appeal in state court. The Court rejects this argument as an unreasonable extension of the *Younger* doctrine; the mere opportunity to commence a proceeding does not render that proceeding pending. Moreover, defendants cite no authority for the proposition that plaintiffs may now file an appeal in state court.

But, even if the state proceedings might be viewed as pending, the Court concludes that *Younger* abstention is inappropriate. *Younger* abstention is applicable only when a pending state proceeding is coercive, that is, initiated by the government. In this case, the state proceedings were initiated by the plaintiffs, as opposed to

the governmental defendants. Just as in *ReMed I*, plaintiffs in this case at both the state and federal level seek to "vindicate a wrong inflicted by the state," rendering these proceedings remedial in nature. *ReMed I*, 1998 WL 437272, at *3. The Court therefore concludes that this is not a proper case for *Younger* abstention.

### 3. *Colorado River* Abstention

■■■ Defendants' third, and final, abstention argument implicates *Colorado River* and the need to conserve judicial resources and avoid duplicative litigation. In raising this argument, however, defendants have not considered the "threshold issue that must be decided in any *Colorado River* abstention case," specifically, "whether the two actions are 'parallel.'" *Ryan v. Johnson*, 115 F.3d 193, 196 (3d Cir.1997). For purposes of *Colorado River* abstention, the phrase, "parallel," necessarily contemplates concurrent actions in both federal court *and state court. See id.* (discussing proceedings in both federal court and state court); *see also Bass*, 258 F.3d at 179 (noting that *Colorado River* abstention only applies to "ongoing" proceedings). In this case, as discussed above, plaintiffs have withdrawn their state court action. There simply are no concurrent parallel proceedings. Accordingly, the Court concludes that this is not a proper case for *Colorado River* abstention.

### B. Plaintiffs' Claim is Ripe.

■■■ Defendants support their assertion that plaintiffs' claim is not ripe by pointing to *Omnipoint Communications, Inc. v. Zoning Hearing Bd. of E. Pennsboro Township*, 4 F.Supp.2d 366 (M.D.Pa. 1998). There, the court concluded that "a landowner's claim challenging the actions of local land planning authorities is not ripe until those authorities have had an opportunity to render a final decision on the dispute." *Id.* at 370 (citing *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 193, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) ("*Williamson County*")). Defendants argue that the Board of Commissioners of Cheltenham Township did not render a "final decision" on the merits of plaintiffs' claim, and that, as a result, plaintiffs' claim before this Court is not ripe.

■■■ Defendants' attempts to apply the reasoning of *Omnipoint* to the present case are off the mark. *Omnipoint* relied on the Supreme Court's decision in *Williamson County* where the Court considered a takings claim under the Just Compensation Clause of the Fifth Amendment to the United States Constitution—a claim quite different from the present FHAA claim. As the Fourth Circuit explained in answering the exact question presented in this case, ripeness analysis should be conducted differently for these two different claims: "[C]onstitutional injury under the Just Compensation Clause does not arise 'unless or until the state fails to provide an adequate *postdeprivation* remedy for the property loss.'" *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 602 (4th Cir.1997) (quoting *Williamson County*, 473 U.S. at 195, n. 14, 105 S.Ct. 3108). This is in sharp contrast to the Fair Housing Act where "a violation occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings." *Id.*

Because plaintiffs allege that they were denied a reasonable accommodation by the Zoning Hearing Board, any remedy that might have been granted by the Board of Commissioners [8] is irrelevant to an assess-

---

**8.** The Court notes that defendants provide no authority for the proposition that plaintiffs

ment of the ripeness of plaintiffs' FHAA claim. The Court therefore concludes that plaintiffs' claim is ripe for adjudication.[9]

### C. The Board and the Township are Proper Defendants.

■■■■ Defendants argue in separate parts of their brief that neither the Board nor the Township are proper defendants in this FHAA suit. At the outset, the Court notes that 42 U.S.C. § 3604 does not limit the defendants who may be sued in a civil action. Several courts in this circuit dealing with similar cases have seen fit to issue injunctions against either zoning boards or municipalities, and, in some instances, against both. *See Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096 (3d Cir.1996) (Township and Zoning Board); *ReMed Recovery Care Ctrs. v. Township of Willistown,* 36 F.Supp.2d 676 (E.D.Pa.1999) (*"ReMed II"*) (Township and Zoning Board); *ReMed I,* 1998 WL 437272 (denying motion to dismiss and allowing action to proceed against Zoning Board); *Judy B. v. Borough of Tioga,* 889 F.Supp. 792 (M.D.Pa.1995) (Borough). As one court has explained in determining what parties could be enjoined from enforcing a zoning ordinance in violation of the FHAA, "parties who were, have been, or will be involved in the evaluation, passage, enforcement, and promulgation" of the zoning requirements at issue are proper defendants. *Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Township,* 996 F.Supp. 409, 440 (D.N.J.1998)

(granting injunction against Zoning Board, Township, and Planning Board). It is clear from this authority that the FHAA has been applied to a broad scope of defendants.

The Board argues that it cannot be held liable under the FHAA because granting plaintiffs' requested reasonable accommodation would have compelled it to exceed its authority. The underlying premise of this argument is simply incorrect. As defendants admit in their statement of the facts, the United States settled its litigation against defendants upon agreement that the Township of Cheltenham would enact "local zoning legislation enabling the Zoning Hearing Board to grant reasonable accommodations in accordance with the terms of the Fair Housing Amendments Act." Defs.' Mem. at 3. This legislation was subsequently enacted. *Id.* For defendants to admit, on the one hand, that the Board was granted authority under the amended ordinance to make reasonable accommodations as required by the FHAA and argue, on the other hand, that granting the requested accommodation would force the Board to exceed its authority defies credulity.

The Board clearly has authority to grant the requested reasonable accommodation. Plaintiffs may therefore allege that, by its failure to grant plaintiffs' requested accommodation, the Board violated 42 U.S.C. § 3604(f)(3)(B).

---

may have appealed the denial of their request for a variance to the Board of Commissioners.

9. To the extent that defendants' arguments here might be interpreted as asserting that plaintiffs failed to exhaust administrative and/or state remedies, *see ReMed I,* 1998 WL 437272, at *5 (construing defendant's ripeness argument as an exhaustion argument), the Court's conclusion would remain the same. It is well settled that plaintiffs are not

required to exhaust FHAA claims. *See* 42 U.S.C. § 3613(a)(2) (allowing for private enforcement of FHAA "whether or not [an administrative] complaint has been filed"); *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 106, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (interpreting legislative history of FHAA to "suggest[ ] that all Title VIII complainants were to have available immediate judicial review").

The Township argues that plaintiffs have not produced any evidence that the Township discriminated against plaintiffs. The Court disagrees. Plaintiffs point to the fact that the Township Building and Zoning Committee—on which members of the Township Board of Commissioners sit—recommended denial of plaintiffs' request for a zoning variance. The same Committee instructed the Township Solicitor to appear at the Zoning Hearing Board meetings and express the Committee's opposition to plaintiffs' requested relief. However, given the Court's conclusion that plaintiffs cannot establish that the proposed residents of plaintiffs' group home were "handicapped," the Court finds it unnecessary to decide this issue.[10]

### D. Defendants are not State Entities and are Therefore not Entitled to Sovereign Immunity Under the Eleventh Amendment to the United States Constitution.

 Defendants argue that the Board is an "agency of the Commonwealth" and is therefore entitled to the sovereign immunity protections of the Eleventh Amendment to the United States Constitution. The Court rejects defendants' argument on the ground that the Board does not meet the threshold requirement for claiming sovereign immunity: it is not a state entity.

 As the Third Circuit has explained, a court must consider three factors in determining the applicability of the Eleventh Amendment: "(1) the source of funding—i.e., whether payment of any judgment would come from the state's treasury, (2) the status of the agency/individual under state law, and (3) the degree of autonomy from state regulation." *Car-*

*ter v. City of Philadelphia*, 181 F.3d 339, 347 (3d Cir.1999). Although these three factors must be balanced, each is not given equal weight. Rather, "the 'most important' question in determining Eleventh Amendment immunity is 'whether any judgment would be paid from the state treasury.'" *Id.* at 348 (quoting *Bolden v. Southeastern Pa. Transp. Auth.*, 953 F.2d 807, 816 (3d Cir.1991)). Placing extra weight on the funding question "is supported by the Eleventh Amendment's central goal: the prevention of federal court judgments that must be paid out of the state's treasury." *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140, 1145 (3d Cir.1995).

Defendants' only argument that the Board deserves sovereign immunity is that it was created pursuant to state law governing municipal planning and development, *see* 53 Pa. Cons.Stat.Ann. § 10901 (requiring municipalities enacting zoning ordinances to create a zoning hearing board), and that some of the Board's procedures are governed by state law. *See* 53 Pa. Cons.Stat.Ann. §§ 10903–10908. The Board's autonomy to dictate its own procedures is certainly limited by state law. Thus, the Court concludes that the third factor, "degree of autonomy from state regulation," favors defendants.

However, defendants cannot prevail on this argument when the other two factors are taken into consideration. In analyzing the second factor, the status of the agency under state law, the Court notes that zoning hearing boards are created by municipalities. *See* 53 Pa. Cons.Stat.Ann. § 10901. Under state law, then, the Board is the quintessential municipal agency. More importantly, on the first question, concerning funding, defendants have

---

**10.** As discussed above, *see supra* note 5, the parties agreed that the Court should decide all fact questions.

made no showing that a judgment entered against the Board would be paid from the state treasury. Taken together, these two factors clearly outweigh any state governance of the Board's procedures and compel the conclusion that the Board is not entitled to sovereign immunity under the Eleventh Amendment.

### E. The Proposed Group Home is a "Dwelling" Under the FHAA.

Defendants next argue that plaintiffs' proposed group home is not a "dwelling," and, therefore, plaintiffs are not entitled to the protections of 42 U.S.C. § 3604.

The FHAA defines "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." 42 U.S.C. § 3602(b). The Third Circuit has had occasion to crystallize this definition in two cases.

First, in *United States v. Columbus Country Club*, 915 F.2d 877, 879 (3d Cir. 1990), the court was faced with the question of whether a group of bungalows used by their occupants as summer homes were "dwellings" under the FHAA. Employing rules of statutory construction and canvassing other cases on the question, the court held "that the central inquiry is whether the defendant's annual members intend to remain in the bungalows for any significant period of time and whether they view their bungalows as a place to return to." *Id.* at 881. In applying this standard, the court found it important that the occupants of the bungalows were not " 'mere transients,' " *id.* (quoting *Baxter v. City of Belleville*, 720 F.Supp. 720, 731 (S.D.Ill. 1989)), and that in any year, the occupants "may spend up to five months in their bungalows." *Id.* The argument that the bungalows were not dwellings, the court said, would effectively "limit coverage of the Act to year-round places of abode." *Id.* Because Congress could not have intended to allow private residents of summer homes to skirt the mandates of the FHAA, the court concluded that the bungalows were indeed "dwellings" under the Act. *Id.*

More recently, the court applied the standards enunciated in *Columbus Country Club* to a nursing home. *Hovsons,* 89 F.3d at 1098. Emphasizing that, "[t]o the handicapped elderly persons who would reside there, [the nursing home] would be their home, very often for the rest of their lives," the court found the facility to qualify as a dwelling. *Id.* at 1102.

The Third Circuit's decisions in *Columbus Country Club* and *Hovsons* instruct that analysis of whether plaintiffs' home would be a "dwelling" under the Act should include, *inter alia,* the following factors: (1) whether occupants would reside in the structure for a significant time period; (2) whether the occupants would be more than mere transients; and (3) whether occupants would view the facility as a place to which they will return.

In applying these factors, defendants attempt to cast plaintiffs' group home as a temporary stop-over for abused, abandoned, and neglected children. They point to the treatment plan for the residents of the home which provides for a designated place of discharge after leaving the facility. Defendants also point to the fact that children residing in the home would be informed that they would be moved elsewhere. Taken together, defendants argue, plaintiffs' proposed home is not a place to which the residents would return.

Plaintiffs argue in response that for the period of their stay in the group home, the

children would treat the home as any other resident would treat his or her own home. The residents would eat their meals together, have housekeeping responsibilities, and sleep in the home. Although the length of their stays would vary, it was anticipated that some children would reside there in excess of nine or ten months.

The Court concludes that defendants' focus on the children's knowledge that they would be moved from the home mischaracterizes the Third Circuit's analysis. Defendants are effectively arguing that when a resident of a home intends at any time to leave that home, the home is no longer a "dwelling" under the Act. In the Court's view, under the Third Circuit's analyses in *Columbus Country Club* and *Hovsons*, a resident's ultimate intent, although entitled to consideration, is not dispositive. The real question is whether the resident, while residing in the home in question, intends to reside in that home for a "significant time period" and is not a "mere transient." *Columbus Country Club*, 915 F.2d at 881. Defendants' argument would potentially remove from the coverage of the FHAA all residential premises leased for finite periods—residences where the occupants may very well

indeed intend to leave the premises after the expiration of a lease. Just as the court in *Columbus Country Club* rejected an analysis that would remove summer homes from the coverage of the FHAA, *see id.* at 881, in this case, the Court refuses to remove from the coverage of the FHAA group homes whose residents reside therein for finite periods.

The Court finds that the proposed residents of plaintiffs' group home would be more than "mere transients," would reside in the home for a significant time period,[11] and would view the home as a place to which they would return. The home would thus be a dwelling under the FHAA.

## F. Plaintiffs Have Failed to Produce Any Evidence That the Proposed Residents of the Group Home Would be Handicapped Under the FHAA.

A threshold issue for finding liability under 42 U.S.C. § 3604(f)(3)(B) is whether the proposed residents of the group home would be "handicapped" under the FHAA.[12] Congress has defined "handicap" as "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

11. The Court notes that the Third Circuit has not identified a minimum time period to meet its definition of "significant." At one extreme, the residents of the nursing home in *Hovsons* would reside there for the remainder of their lives. At the other extreme, *Columbus Country Club* involved individuals who occupied summer homes for, at the most, five months at a time—albeit repetitively for many years. The Court concludes that no "magic number" is required. Rather, the analysis appears to be a flexible one that takes all factors into consideration. The fact that it was anticipated that the residents of plaintiffs' proposed home would reside there for up to nine or ten months, when considered in tandem with the other characteristics of the home, satisfies the Court that the "significant" time period standard has been met.

12. The Court notes that plaintiffs themselves need not be handicapped and are permitted to argue on behalf of the proposed residents of their home that defendants discriminated against those residents on the basis of their handicap. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) ("[T]he sole requirement for standing to sue under [the FHAA] is the Art. III minima of injury in fact."); *Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1282 n. 6 (3d Cir.1993) (quoting 42 U.S.C. § 3602(i)) (" '[A]n aggrieved person' does not necessarily have to be the person discriminated against.").

(2) a record of having such impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h). The definitions of "handicap" in both the FHAA and the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, as well as the definition of disability in the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA"), are "virtually identical" and are therefore used interchangeably. *Support Ministries for Persons with AIDS, Inc. v. Village of Waterford,* 808 F.Supp. 120, 130 (N.D.N.Y.1992).

Plaintiffs argue that the proposed residents of their home would be handicapped under either the first or third prongs of the definition of handicap in 42 U.S.C. § 3602(h): that they would have a physical or mental impairment which substantially limits one or more major life activities, or that they would be regarded as having such an impairment. A review of the parties' submissions and the record, however, compels the Court to find that, as a matter of law, plaintiffs cannot prove that the proposed residents of the group home would be handicapped under either prong of the definition. The Court will consider each prong of the definition in turn.

### 1. Physical or Mental Impairment Substantially Limiting a Major Life Activity

On the first prong of the handicap definition, plaintiffs' claim fails for two separate reasons. First, plaintiffs have failed to produce evidence concerning physical or mental impairments suffered by specific residents of plaintiffs' proposed group home. Second, assuming, *arguendo,* that plaintiffs have produced sufficient evidence concerning physical or mental impairments, they have failed to produce any evidence showing that these alleged impairments substantially limit one or more of the proposed residents' major life activities.

### a. Failure to Allege Impairments With Respect to Specific Residents of Plaintiffs' Proposed Group Home

At the outset, the Court notes that, following the Supreme Court's decision in *Sutton v. United Air Lines,* 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), the Court must conduct an "individualized inquiry" in evaluating whether the potential residents of plaintiffs' group home would be handicapped under the FHAA. *See also, Albertson's Inc. v. Kirkingburg,* 527 U.S. 555, 566, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (discussing "statutory obligation to determine the existence of disabilities on a case-by-case basis").

In *Sutton,* the Court dealt with the issue of whether mitigating measures should be considered in determining whether a person is disabled under the ADA. Specifically, the petitioners before the Court, twin sisters who suffered from severe myopia, argued that they should be considered disabled under the ADA notwithstanding the fact that their myopia could be corrected with glasses or contact lenses. *Sutton,* 527 U.S. at 475, 119 S.Ct. 2139. The Court, expressing concern about the logical extension of this position, rejected the petitioners' argument. Developing a hypothetical, the Court explained that under the petitioners' suggested analysis, all diabetics could "almost certainly be disabled, because if they failed to monitor their blood sugar levels and administer insulin, they would almost certainly be substantially limited in one or more major life activities." *Id.* at 483, 119 S.Ct. 2139. This would mean that "[a] diabetic whose illness does not impair his or her daily activities would therefore be considered disabled simply because he or she has diabetes." *Id.* This suggested analysis would result in treating persons "as members of a

group of people with similar impairments, rather than as individuals." *Id.* at 483–84, 119 S.Ct. 2139. The Court found this analysis contrary to the language of the ADA, which refers to disability with respect to an "individual." *Id.* at 483, 119 S.Ct. 2139 (citing 42 U.S.C. § 12102(2)).[13]

Following the Supreme Court's analysis in *Sutton*, plaintiffs in this case must establish that individual children who would reside in plaintiffs' proposed group home would suffer from an impairment that substantially limits one or more of such children's major life activities.[14] Although they do not cite the Supreme Court's decision in *Sutton* (or, for that matter, *Albertson's*), defendants essentially echo this principle by asserting that children who are abused, abandoned, and/or neglected, do not, without more evidence, constitute handicapped individuals. The Court notes that very few courts have considered this issue.

Defendants point to two state court opinions rejecting arguments that children similar to the proposed residents in this case are handicapped. In the more relevant of these two cases,[15] *Sunderland Family Treatment Svs. v. City of Pasco,*

127 Wash.2d 782, 903 P.2d 986, 989 (1995), the Supreme Court of Washington considered a request for a special use permit to establish a group home for abused or neglected children. At the administrative level, the plaintiffs in the case failed to argue that the abused or neglected children were handicapped. *Id.* at 991. Because the court limited its review to the factual record established at the administrative level, the court refused to consider the plaintiff's argument made only on appeal that the children were emotionally disturbed and, in turn, handicapped under the relevant statute. *Id.* Rather, the court limited its consideration to the question of whether abuse and neglect themselves would render the children handicapped. *Id.* Explaining that the Washington statute incorporated the definition of "handicap" in 42 U.S.C. § 3602(h) (the FHAA), the court looked to federal regulations implementing both the FHAA and the Rehabilitation Act.

The court found particularly relevant one portion of the Rehabilitation Act regulations stating: "[O]nly physical and mental handicaps are included. Thus, environmental, cultural, and economic disadvantage are not in themselves cov-

---

**13.** In contrast to the phrase, "individual," the FHAA defines handicap with respect to a "person." 42 U.S.C. § 3602(h). This minor word difference does not make *Sutton* any less applicable in the FHAA context.

**14.** It should be noted that the Court's conclusion in *Sutton* that disability should be evaluated with respect to an individual focused on how individuals with the same impairment are limited in different ways by that impairment. *See Sutton,* 527 U.S. at 483, 119 S.Ct. 2139 (noting that while "a person whose physical or mental impairment is corrected by mitigating measures still has an impairment," when the impairment is corrected by mitigating measures, the impairment "does not 'substantially limi[t]' a major life activity"). This analysis is slightly different from that relevant in this case where the Court focuses on plain-

tiffs' failure to demonstrate individualized *impairments.* Nevertheless, the principle discussed in *Sutton* remains applicable to the Court's evaluation of plaintiffs' claim.

**15.** One of the cases cited by defendants, *Act I, Inc. v. Zoning Hearing Bd. of Bushkill Township,* 704 A.2d 732 (Pa.Commw.1997), is distinguishable from the present case. Although the zoning ordinance in *Act I* incorporated the definition of handicap in 42 U.S.C. § 3602(h), and the group home was for abused children adjudicated "dependent" by a juvenile court, the plaintiffs openly stated on the record that the children at the facility "are neither physically or mentally handicapped nor socially or emotionally disturbed." *Id.* at 734. Plaintiffs make no such concession in this case.

ered.... Of course, if a person who has any of these characteristics also has a physical or mental handicap, the person is included within the definition of handicapped person." *Id.* (quoting 45 C.F.R. pt. 84, app. A, at 355 (1994)). Using this definition, the court concluded that abused and neglected children are "not handicapped because abuse and neglect are environmental and cultural factors." *Id.* The court did, however, leave an opening for a finding that abused and neglected children are handicapped, stating that abuse and neglect "undoubtedly produce physical or mental effects." *Id.*

A more recent case, not cited by either party in this context, considered the question left open by *Sunderland:* whether abused and neglected children may have physical or mental impairments that substantially limit a major life activity. *See Keys Youth Svs., Inc. v. City of Olathe,* 52 F.Supp.2d 1284, 1297–1300 (D.Kan.1999), rev'd on other grounds, 248 F.3d 1267 (10th Cir.2001) ("*Keys* ").

The plaintiff in *Keys* was a not-for-profit corporation that operated a number of group homes for abused, neglected, and abandoned teen-aged children. *Id.* at 1288. When seeking to open a new home, plaintiff applied to defendant city for a special use permit to allow operation of the home in an area where the zoning requirements did not allow such a facility. In hearings before the defendant Planning Commission, plaintiff presented a significant amount of evidence concerning its allegations that the residents of the home

would meet the FHAA's definition of handicapped. Although the plaintiff's existing homes never required residents to possess a physical or mental impairment as a condition of admission to a home, plaintiff asserted that at least 95 percent of the youth residing in those existing homes had mental health problems. Plaintiff also provided "specific information about typical residents of Keys homes." *Id.* at 1292. An expert testifying before the Planning Commission for the plaintiff cited one resident of a Keys home who "had a specific learning disability which caused frustration and behavioral problems." *Id.* Ultimately, the *Keys* court found that although not all of the potential residents of the plaintiff's proposed home would be "handicapped," the plaintiff had "establishe[d] as a matter of law that *some* potential residents meet the FHA[A] definition of handicapped, in that they have mental impairments which substantially limit the major life activity of learning." *Id.* at 1299.

The Court finds that the facts of the present case fall somewhere between those considered by the court in *Keys*[16] and the court in *Sunderland.* In contrast to the group home operators in *Sunderland,* plaintiffs in this case have presented some evidence concerning handicapped status under the FHAA. The testimony, however, lacks the certainty and precision of the evidence presented on the administrative record in *Keys.* Specifically, plaintiffs failed to produce evidence that any of their potential residents would have a physical or mental impairment.

**16.** The Court notes its disagreement with the *Keys* court in its treatment of handicap as a question of law. Courts in this circuit have treated the issue of disability in cases under the ADA as an issue of fact. *See Simonetti v. Runyon,* No. 98–2128, 2000 WL 1133066, at *7 (D.N.J. Aug. 7, 2000); *DiBenedetto v. City of Reading,* No. 96–5055, 1998 WL 474145, at *14 (E.D.Pa. July 16, 1998). The phrase,

"handicap," under the FHAA is defined in the same way as "disability" under the ADA. Following the precedent of the ADA cases, the Court concludes that the issue of "handicap" is properly considered an issue of fact. Notwithstanding this difference of opinion, the *Keys* court's analysis is quite helpful as a basis for comparison.

The testimony summarized in plaintiffs' briefs and the additional evidence included in the Board record refers to the handicap issue in only the vaguest of terms. Every witness who testified concerning handicap suggested that, *generally,* children who are abused, abandoned, and/or neglected *might* be handicapped. As an example, the Court points to the following question-and-answer exchange with plaintiffs' expert, Mary Riggs–Cohen:

Q. Do many of the children that you have worked with during the course of your 17 year career have a physical or mental impairment that would substantially limit one or more of their major life activities?

A. Yes.

Children who have been neglected, abused, physically or sexually have, I would say, the primary impairment that they have is in their ability to establish and maintain relationships with other people, adults or their peer group.

They're very mistrusting of adults because of the types of abuse situation[s] that they have been in.

They are also impaired in their functioning in school because they are usually anxious and nervous because they have been in very unprotected environments where they have had a lot of unpredictable things happen to them.

They can be excessively fearful because of the abuse situations that they have suffered.

They frequently have sleep disturbances.

They may have eating problems.

They may have problems with be[d] wetting or other types of physical function because of their anxiety.

Most of these children have very low self esteem. They actually see themselves as "bad" or "crazy" because they have to justify the fact that they have been abused and they feel that they are worthy of this abuse; that they are deserving of abuse. So, they have very low self esteem and they particularly need a nurturing environment to reverse the self image that they have.

Testimony of Mary Riggs–Cohen, R., Sept. 18, 1995, at 134–36.

Dr. Riggs–Cohen's testimony makes a convincing case that many children who are abused, abandoned and/or neglected suffer from mental and physical impairments. What is missing from this testimony, however, is any statement concerning the impairments of a specific child who would reside in plaintiffs' group home. Significantly, the Court notes that even when questioned about the specific residents of plaintiffs' group home, Dr. Riggs–Cohen's testimony did not provide any more detail:

Q. In your opinion, will the children who will reside at this community residence to be known as Safe Haven have a mental impairment which substantially limits one or more of their major life activities?

A. Yes.

As I mentioned some of those types of impairments, frequently these children also have learning problems and difficulty in their school functioning, (I don't think I mentioned that before.), they may actually have physical impairments because of malnutrition or other types of neglect that they have suffered or from physical abuse.

Q. They would have a delayed motor skill problem?

A. Yes.

As I mentioned, they may actually delay their own development or inhibit their own development to keep from

causing abuse to be brought upon themselves.

Q. What other types of problems are manifested by these children?

Can you give us a few other examples?

A. Well, these children because of their low self esteem they don't necessarily try in every situation, they don't feel that they can be successful in situations so they frequently give up in school.

They have poor academic performance.

Their peer relationships[,] they would rather isolate than try to establish new relationships.

*Id.* at 137–38. Again, this general testimony fails to produce any evidence concerning the impairment suffered by the proposed residents of plaintiffs' group home. *Cf. Keys*, 52 F.Supp.2d at 1299 (finding record to establish residents of proposed group home would be handicapped).

With this record, plaintiffs are essentially asking the Court to find that because abused, abandoned, and/or neglected children *might generally* be handicapped, the children at issue in this case would *in fact* be handicapped. This suggested analysis, however, directly contradicts the United States Supreme Court's declaration that courts must conduct an individualized inquiry in deciding the question of disability and/or handicap. *See Sutton*, 527 U.S. at 483, 119 S.Ct. 2139. Plaintiffs have simply produced no evidence with respect to a specific child's impairment.[17] Plaintiffs' FHAA claim must therefore fail.

One might very well argue that individuals seeking to operate a group home like plaintiffs' proposed home would never know for certain whether the residents of their home would meet the definition of handicapped. The Court's above reasoning—that plaintiffs' evidence was too speculative to meet the requirements of the FHAA—might therefore be perceived to forestall any opportunity for the operators of a proposed group home to challenge the decision of a local zoning agency under the provisions of the FHAA.

This is not at all the case. FHAA claimants like plaintiffs in this case need only follow the example of the plaintiff in *Keys* who presented thorough, detailed evidence that the proposed residents of the group home would in fact suffer from a mental or physical impairment and that, in turn, these impairments substantially limited one or more of the children's life activities. Even if operators of proposed group homes could not present such evidence, they still have an opportunity to set admission standards which require residents to have certain impairments. Plaintiffs' stated qualifications for admission to the group home provided:

---

**17.** This case is thus clearly distinguishable from *Keys*. The *Keys* court issued the opinion analyzed above before the Supreme Court's decisions in *Sutton* and *Albertson's*. Once these cases were decided, the defendant in *Keys* moved the court for reconsideration on the ground, in part, that the court had not properly conducted the individualized inquiry required by *Sutton* and *Albertson's*. *See Keys Youth Svs., Inc. v. City of Olathe*, 67 F.Supp.2d 1228, 1229 (D.Kan.1999) (describing defendant's motion for reconsideration). The court rejected the defendant's argument, explaining that the court had in fact conducted such an inquiry and that "[t]he record is clear that at least some potential residents *will* be learning disabled, and entitled to FHA[A] handicapped protection." *Id.* at 1231 (emphasis added). The plaintiff's evidence in *Keys* thus established the handicapped status of at least some of the individual proposed group home residents, whereas, in this case, plaintiffs present nothing more than evidence concerning abused, abandoned and/or neglected children generally.

In order for a child to be accepted for residence by Safe Haven for Children, Inc., he or she must satisfy the following:

1. The child must be between the age of 5 and 9 years and 2 month [*sic*].

2. Referrals will be through interagency teams serving Montgomery County.

3. The child must be appropriate for the program and site location.

4. The child will be referred with a complete and current medical, clinical, social and educational history and recommendations.

5. The child will be referred with an Individualized Education Plan (IEP) and an education service plan developed by the interagency planning team.

6. The child's family must support the referral recommendation and express a willingness to support their child and participate in the development and execution of treatment plan.

7. Referrals are considered without regard to race, religion, national origin, etc.

Defs. Mot., Ex. I, at 21. None of these admission standards require a resident to have a physical or mental impairment.

Setting admission standards tied to the FHAA's definition of handicap does not place an onerous burden on group home operators who seek FHAA protection. It simply ensures that the purposes of the FHAA are properly implemented. The Court concludes that municipal defendants should not be held liable for discriminating under the FHAA on the basis of handicap when an operator of a proposed group home fails to produce any evidence that the specific targets of the purported discrimination in fact suffer from a physical or mental impairment.

**b. Failure to Produce Evidence That an Alleged Impairment Substantially Limits One or More Major Life Activities**

█ Assuming, *arguendo,* that the record contained evidence that the residents of the proposed group home suffered from some physical or mental impairment, plaintiffs still have not produced sufficient evidence to survive summary judgment because proof of handicap requires more than simply establishing the existence of an impairment. The Supreme Court of the United States has explained that the inquiry as to disability and/or handicap requires two additional steps. *See Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). First, the Court identifies the life activity upon which a plaintiff relies "and determine[s] whether it constitutes a major life activity." *Id.* Second, the Court considers the impairment alleged, and, "tying the two statutory phrases together ... ask[s] whether the impairment substantially limit[s] the major life activity." *Id.* Following *Bragdon,* then, plaintiffs have the burden of proving these two additional facts.

Plaintiffs in this case produced no evidence showing how any of the impairments alleged in their submissions might substantially limit major life activities. Their arguments are limited to mere conclusory statements that an impairment meets the definition of handicap. As an example of plaintiffs' failure to produce evidence on these two additional facts, the Court examines the one impairment plaintiffs allege with any remote degree of certainty—the decreased "ability to establish and maintain relationships." Testimony of Mary Riggs–Cohen, R., Sept. 18, 1995, at 135 (discussing the "primary impairment" potentially suffered by abused, abandoned

and/or neglected children). Although the Court concludes the record does not contain evidence concerning this impairment with respect to any specific resident of plaintiffs' proposed group home, even if it did, plaintiffs have not, as required by *Bragdon*, produced evidence showing that this specific impairment substantially limits a major life activity.

Assuming, *arguendo*, that plaintiffs are arguing the alleged impairment of decreased ability to establish and maintain relationships substantially limits the major life activity of interacting with others, plaintiffs have failed to meet this burden. The first question under *Bragdon*, then, is whether "interacting with others" qualifies as a major life activity. Two circuits that have considered this question have arrived at differing results. On the one hand the First Circuit has held that "the ability to get along with others" is not a major life activity. *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 15 (1st Cir.1997). On the other hand, the Ninth Circuit has held that "[b]ecause interacting with others is an essential, regular function, like walking and breathing, it easily falls within the definition of 'major life activity.'" *McAlindin v. County of San Diego*, 192 F.3d 1226, 1234 (9th Cir.1999). *See also Cooper v. Olin Corp.*, 246 F.3d 1083, 1089 (8th Cir.2001) (declining opportunity to decide whether interacting with others constitutes major life activity); *Steele v. Thiokol Corp.*, 241 F.3d 1248, 1254–55 (10th Cir. 2001) (same); *Herschaft v. N.Y. Bd. of Elections*, 2001 WL 940923, at *4 n. 7 (E.D.N.Y. Aug. 13, 2001) (noting disagreement on question). This Court expresses no opinion on this question. It takes that position because even if interacting with others qualified as a major life activity, as the Ninth Circuit has ruled, plaintiffs have not produced any evidence that the impairment of decreased ability to establish and maintain relationships would substantially limit the major life activity of interacting with others.

As the Ninth Circuit explained, "[r]ecognizing interacting with others as a major life activity of course does not mean that any cantankerous person will be deemed substantially limited in a major life activity." *McAlindin*, 192 F.3d at 1235. Rather, "a plaintiff must show that his 'relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary.'" *Id.* (quoting *EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities* 5 (March 25, 1997)). Beyond their conclusory statements concerning the alleged impairment suffered by the proposed residents of their group home, plaintiffs produce no evidence that this impairment would engender such "severe problems" as required by the Ninth Circuit's decision in *McAlindin*.

For the foregoing reasons, the Court concludes that plaintiffs have failed to produce any evidence that the proposed residents of the group home would have any physical or mental impairments that substantially limit major life activities.

### 2. "Regarded as" Having a Physical or Mental Impairment Substantially Limiting a Major Life Activity

The inability of a plaintiff to establish that a specific potential resident of a group home would be handicapped does not eliminate the protections of the FHAA in cases like the present one. That is so because a plaintiff is given an opportunity to meet his or her burden under the "regarded as" prong of the statutory definition of handicap. Specifically, group home operators unable to show that potential residents of their proposed home would in

fact be handicapped could still show that a defendant municipality viewed the potential residents as such. However, plaintiffs in this case have failed to produce any such evidence.

Plaintiffs point only to one piece of evidence in support of their argument that the potential residents of the group home would be "regarded as" handicapped. That evidence is the testimony of defendants' expert witness, Bertram Ruttenberg. After discussing potential impairments that might be suffered by a child due to abandonment, Dr. Ruttenberg answered in the affirmative to the question of whether "those mental impairments resolve [sic] in a person being *considered* mentally handicapped." Testimony of Bertram Ruttenberg, R., November 2, 1995, at 135 (emphasis added). Plaintiffs focus on the word "considered"—a word that, notably, was injected into the testimony by plaintiffs' counsel—to suggest that the proposed residents of the group home were "regarded as" handicapped. Although the Court doubts that Dr. Ruttenberg's testimony can fairly be read to suggest that the residents of the proposed group home would be regarded as handicapped, plaintiffs' argument suffers from a more fundamental fault. Plaintiffs have failed to produce any evidence whatsoever that defendants in this action regarded the proposed residents as handicapped. If de-

fendants discriminated against plaintiffs on the basis of handicap, as plaintiffs allege, plaintiffs must make some showing that it was defendants who regarded the proposed residents of the group home as handicapped.[18] Plaintiffs do not do so. To the contrary, the evidence in the record suggests the exact opposite. The Board specifically found that the proposed residents of the group home were not handicapped. This express ruling contradicts any suggestion that the Board regarded the proposed residents as handicapped.[19]

For the foregoing reasons, the Court concludes that plaintiffs have not produced any evidence that the proposed residents of the group home were regarded as handicapped.

## V. CONCLUSION

Plaintiffs have failed to produce any evidence that the proposed residents of their group home would be handicapped under any prong of the FHAA's definition. Thus, plaintiffs' claim under the FHAA must fail; defendants' Motion for Summary Judgment is granted and Plaintiffs' Cross Motion for Summary Judgment is denied.

An appropriate order follows.

### *ORDER*

**AND NOW,** this 15th day of November, 2001, upon consideration of Defendants'

---

**18.** This logic follows directly from the Third Circuit's decision in *Tice v. Centre Area Transp. Auth.,* 247 F.3d 506, 514 (3d Cir. 2001). There, the court explained that a plaintiff in an ADA case alleging disability under the "regarded as" prong of the definition must prove either that "(1) despite having no impairment at all, the *employer* erroneously believes that the plaintiff has an impairment that substantially limits major life activities; or (2) the plaintiff has a non-limiting impairment that the *employer* mistakenly believes limits major life activities." *Id.* (citing *Sutton v. United Air Lines,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d

450 (1999)) (emphasis added). The court's focus on whether a defendant employer regards an ADA plaintiff as disabled can only mean that the "regarded as" inquiry hinges on a defendant's perceptions.

**19.** The Court cautions that a zoning board's mere finding that proposed residents of a group home were not handicapped does not presumptively eliminate a "regarded as" claim. It is entirely possible that a defendant zoning board could make such a finding unsupported by any evidence. That, however, is not the situation presented in this case.

Motion for Summary Judgment (Document No. 64, filed March 9, 2001), Plaintiffs' Answer to Defendants' Motion for Summary Judgment and Plaintiffs' Cross Motion for Summary Judgment (Document No. 66, filed March 22, 2001), the record of proceedings before the Zoning Hearing Board of Cheltenham Township,[1] and the supplemental filings of the parties, for the reasons stated in the attached Memorandum, **IT IS ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED,** Plaintiffs' Cross Motion for Summary Judgment is **DENIED,** and **JUDGMENT IS ENTERED** in **FAVOR** of defendants Township of Cheltenham and Zoning Hearing Board of Cheltenham Township and **AGAINST** plaintiffs Sidney Cohen, Dorothy Cohen and Susan Cohen.

---

1. The record of proceedings before the Zoning Hearing Board shall be docketed.